UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CIVIL-DIVISION

| | |
|---|---|
| **GEORGE & COMPANY LLC,** | : |
| | : |
|     **Plaintiff,** | : |
| | :    **Case No. 1:19-cv-04391** |
| **v.** | : |
| | :    **Jury Demanded** |
| **SPIN MASTER CORP;** | : |
| **SPIN MASTER US HOLDINGS, INC.;** | : |
| **SPIN MASTER LTD; SPIN MASTER, INC.;** | : |
| **CARDINAL INDUSTRIES, INC.;** | : |
| **WALMART INC., a foreign profit corporation;** | : |
| **and JOEL BERGER, an individual,** | : |
| | : |
|     **Defendants.** | : |
| | : |
| | : |

COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF
(JURY TRIAL DEMANDED)

Plaintiff, George & Company LLC, sues Defendants, Spin Master Corp; Spin Master Ltd.; Spin Master US Holdings Inc., Spin Master Inc.; Cardinal Industries Inc.; Walmart Inc.; and Joel Berger, an individual (all collectively, "Defendants")[1], and alleges:

## NATURE OF THE ACTION

1.    Plaintiff, a world-renowned game company and the owner and distributor of Plaintiff's award-winning LCR® and LCR LEFT! CENTER! RIGHT!® dice game ("Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game"), files this Complaint against Cardinal for:

    1)  Breach of Contract;

---

[1] Plaintiff initially brought claims against Defendants in Florida. Those claims have been dismissed against all Defendants except for Cardinal Industries Inc. at this point due to lack of personal jurisdiction. We plan to move Cardinal to this action in New York.

2) Declaratory Judgment;
3) Breach of Fiduciary Duty;
4) Federal Trademark Infringement;
5) Contributory Federal Trademark Infringement;
6) Federal False Designation of Origin, Passing Off, and Unfair Competition;
7) Contributory Federal False Designation of Origin, Passing Off, and Unfair Competition;
8) New York Unfair Competition;
9) Contributory New York Unfair Competition;
10) New York Common Law Trademark Infringement and Unfair Competition;
11) Contributory New York Common Law Trademark Infringement and Unfair Competition; and
12) Conspiracy to Infringe Plaintiff's Marks and Unfairly Compete with Plaintiff.
13) Fraud in the Inducement

and against Walmart for:

14) Federal Trademark Infringement;
15) Federal False Designation of Origin, Passing Off, and Unfair Competition;
16) New York Unfair Competition;
17) New York Common Law Trademark Infringement and Unfair Competition; and
18) Conspiracy to Infringe Plaintiff's Marks and Unfairly Compete with Plaintiff.

## THE PARTIES AND JURISDICTION

2.      Plaintiff is a limited liability company organized under the laws of Florida. It maintains an office in Bonita Springs, Florida.

3.      Defendant Cardinal Industries Inc. ("Cardinal") is a corporation, organized under the laws of the State of New York with its principal place of business in Long Island City, New York.

4.      Cardinal is doing business in U.S. commerce, and/or has committed the acts complained of herein in the State of New York and throughout the United States.

5.      As best understood, Cardinal is the subsidiary of several Spin Master companies, represented in the following chart, which depicts an interlocking network for the sale and distribution of the infringing merchandise:



*Fig. 1*

6.      Defendant Spin Master Corp. is a Canadian publicly traded company organized under the laws of Canada and with a principal place of business in Toronto, Canada. Spin Master Corp. claims that it, through Spin Master Ltd. and its subsidiaries, is a children's entertainment company engaged in the design, marketing and sale of entertainment products for children. Spin Master Corp. does a substantial volume of business in this District and occupies a 25,000 square feet office in The Factory in Long Island City, New York, where it engages in substantial business with Cardinal and other Spin Master companies.

7.      Spin Master Corp. claims to be a "leading global children's entertainment company that creates, designs, manufactures, licenses and markets a diversified portfolio of innovative toys, games, products and entertainment properties" and operates the website located at www.spinmaster.com.

8.      Defendant Spin Master Ltd. is a Canadian company with its principal place of business in Toronto, Canada that also does a substantial volume of business in New York and has offices in Long Island City, New York. Spin Master Ltd.is a subsidiary of Spin Master Corp.

9.    Defendant Spin Master US Holdings Inc. ("SM Holdings") is a corporation, organized under the laws of the State of Delaware with its principal place of business in New York, that does a substantial volume of business in this District and Florida. SM Holdings is a subsidiary of Spin Master Ltd.

10.    Defendant Spin Master Inc. is a corporation, organized under the laws of the State of Delaware. It is registered to do business in New York and maintains a substantial business presence in New York City. Its principal place of business is, on information and belief, in Los Angeles, California, Spin Master Inc. is an indirect wholly owned subsidiary of Spin Master Ltd. through SM Holdings.

11.    Defendant Walmart, Inc. ("Walmart") is a Delaware corporation registered to do business in New York and maintains an office at 111 8th Ave, New York, New York. Its principal place of business is located at 708 SW 8th Street, Bentonville, Arkansas 72716.

12.    Walmart is one of the largest retailers in the world and has retail stores, supercenters and other facilities throughout New York, including stores in Long Island, New York which distribute the products, namely dice games, which are the subject of this action.

13.    As provided in more detail below, Walmart is infringing and has infringed Plaintiff's trademarks and has engaged in acts of unfair competition and related torts in this State and District, acting in concert with Cardinal.

14.    This Court has original jurisdiction over this action and the parties under the Lanham Act, 15 U.S.C.§1051 *et seq.,* including §§ 1114-1117, 1125, and 28 U.S.C.§1391 and §1338(a) and (b), as well as the principles of pendent jurisdiction.

15.    This Court has supplemental jurisdiction over substantially related claims against the Defendant under 28 U.S.C. §1367.

16.    The Court has jurisdiction to enter a declaratory judgment under 28 U.S.C. §2201, and the

declaratory claim arises under the Lanham Act

17.     Defendant Cardinal distributes the infringing products which are the subject of this action to alleged licensees of the Spin Master, Ltd. marks, including upon information and belief licensees within the State of New York and within this Division.

18.     Defendant also distributes the infringing Knock-Off described hereinafter to Walmart and other national retailers well intending to cause and aiding and abetting such retailers to cause acts of direct trademark infringement within this state and division and has actively aided and abetted such direct infringement.

19.     Defendant Cardinal has caused to be distributed the infringing products and services within the State of New York and in this Division and District and had done so for the purpose of committing the acts of infringement and civil wrongs alleged herein by, among other means, arranging for the delivery of infringing products to its retailer customers within this State and Division and using agents and sister companies to service the retail display and distribution of the retailers products in this State and Division, including causing agents of the Spin Master companies to aide and assist the acts of infringement within this State and Division by such retailer customers, such as Walmart.

20.     In the case of Walmart, Defendant Cardinal caused data entries to be made in the Walmart database knowing that the acts of infringement and consumer deception alleged herein would be committed in this State and Division, including the use of Plaintiff's incontestable mark LCR as well as the inherently distinctive LCR/LEFT CENTER RIGHT, to confuse and deceive consumers in this State and Division, well intending to cause such confusion.

21.     The Court has jurisdiction over Defendants in this State and Division under applicable state law because the claims asserted herein arise from the breach of the Trademark License described hereinafter and the commission of torts and fraud in this state, including trademark infringement and breach of fiduciary duty in this State, caused by Cardinal both within this State and outside of this State but with the intent to injure Plaintiff and resulting injury to Plaintiff in this State.

22.     Venue is proper in this Judicial District under 15 U.S.C.§ *et seq.*

23.     Venue is also proper in this District under 28 U.S.C.§1391 (b) and (c) because Defendant is doing business in this District and a substantial portion of the activity about which Plaintiff complains has taken place herein.

<u>**PLAINTIFF'S GENUINE LCR/LEFT CENTER RIGHT GAME**</u>

24.     The versions of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game include:



*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*



*Fig. 6*

25.     Plaintiff has marketed and sold dice, dice games, party games, board games, card games, and/or related entertainment products to the public for more than a century, with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game being its most popular and successful game.

26.     Plaintiff's efforts and accomplishments have made it a well-known and recognized name in the game and related entertainment product industries. Plaintiff has earned its enviable reputation as a result of its commitment to providing the highest quality goods and products.

27.     Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game is distributed and sold throughout the United States and abroad under one or more of Plaintiff's Marks, including the LCR® and LCR LEFT! CENTER! RIGHT!® brands.

28.     Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game is a best-selling product, with multiple millions of units of the game having been sold by Plaintiff.

29.     Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game is exceedingly popular and commercially successful.  For example, Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game is and has remained the number one best seller in dice games on Amazon.com.  Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game has also been featured on, among other shows and publications, the "Rachael Ray Show" and the New York Times, televised nationally on the ABC television network, as well as featured at www.rachaelrayshow.com. The well-known *TDmonthly Magazine*, a trade magazine for the toy, hobby, game and gift industry, has listed Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as one of the "Top 10 Most Wanted Games," and retailers often identify Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as their "No. 1" and "biggest" seller.

30.     As a result of Plaintiff's unceasing and wildly successful efforts, Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game has been known and loved throughout the world for

decades, by people of all ages. For over a century, Plaintiff is and has been a highly respected and family owned business, having invented, created, manufactured, launched and continuously supplied one of the most successful games in history. Plaintiff has done this all within the same, longstanding, family business which dedicates itself to this high quality, original, and authentic game.

31.    As a result of decades of hard work and dedication, Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game has become a classic.

32.    Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game remains today, as it has always been, the one and only original, high quality, authentic LCR® and LCR LEFT! CENTER! RIGHT!® dice game.

## PLAINTIFF'S TRADEMARK RIGHTS

33.    Plaintiff owns all right, title, and interest in the common law trademarks "LEFT CENTER RIGHT" for dice games, party games, and board games featuring specially marked dice and chips. In addition, Plaintiff owns, among others, the following trademarks (hereinafter, collectively referred to as "Plaintiff's Family of Marks" or "Plaintiff's Marks"), including without limitation, all right, title and interest in and to:

(1)    LEFT, CENTER, OR RIGHT - DON'T LOSE YOUR CHIPS!, United States Trademark Registration No. 4519607;

(2)    LEFT, CENTER, OR RIGHT - DON'T LOSE YOUR CHIPS!, United States Trademark Registration No. 5091344;

(3)    LCR LEFT! CENTER! RIGHT! and design, United States Trademark Registration No. 4519608;

(4)    LCR LEFT! CENTER! RIGHT! and design, United States Trademark Registration No. 5091343;

(5)    LCR and design, United States Trademark Registration No. 2802321 (a registration which has become incontestable according

to United States trademark law);

(6)   LCR, United States Trademark Registration No. 2989658 (a registration which has become incontestable according to United States trademark law);

(7)   PLAY LCR WITH CHIPS OR WHATEVER MAKES IT FUN FOR YOU, United States Trademark Registration No. 3854443 (a registration which has become incontestable according to United States trademark law);

(8)   LCR, United States Trademark Registration No. 3917337 (a registration which has become incontestable according to United States trademark law);

(9)   LCR, United States Trademark Registration No. 3917401 (a registration which has become incontestable according to United States trademark law);

(10)   PLAY LCR WITH CHIPS OR WHATEVER MAKES IT FUN FOR YOU, United States Trademark Registration No. 3922749 (a registration which has become incontestable according to United States trademark law);

(11)   LCR and design, United States Trademark Registration No. 4002630 (a registration which has become incontestable according to United States trademark law);

(12)   LCR and design, United States Trademark Registration No. 4119570 (a registration which has become incontestable according to United States trademark law);

(13)   LCR, United States Trademark Registration No. 4132929 (a registration which has become incontestable according to United States trademark law);

(14)   LCR LCR LCR LCR and design, United States Trademark Registration No. 4229002 (a registration which has become incontestable according to United States trademark law);

(15)   LCR, United States Trademark Registration No. 4006384 (a registration which has become incontestable according to United States trademark law);

(16)   LCR and design, United States Trademark Registration No. 4201291;

(17)    LCR WILD, United States Trademark Registration No. 4419874;

(18)    as well as many other related marks, including common law marks, all with longstanding and prior use, covering a variety of goods and services, including, without limitation, dice games, party games and board games featuring specially marked dice and chips, and many related goods and services.

34.    Plaintiff's Family of Marks are well-known to the public, legally valid, and subsisting, and owned exclusively by Plaintiff.

35.    Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game has been widely advertised and extensively offered for sale under Plaintiff's Marks. As a result of Plaintiff's widespread and extensive use of Plaintiff's Marks, and the public's widespread and favorable acceptance and recognition of them, Plaintiff's Marks have become assets of substantial value as a symbol of Plaintiff, its quality goods, goodwill, and reputation.

36.    Plaintiff enjoys considerable success and an enviable reputation in its industry and trade due in large part to its use of, and rights in, Plaintiff's Marks.

37.    Plaintiff has invested significant resources advertising and promoting Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game using Plaintiff's Marks in order to achieve the success it now enjoys. As a result of Plaintiff's investment, Plaintiff's Marks have become synonymous with high-quality goods in its industry and related fields. Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game has become well known and is in great demand throughout the U.S. and the world.

38.    Plaintiff's Marks have been extensively and continuously advertised and promoted to the public through various means, including, but not limited to, appearances at toy shows, displays in retail stores, and on the internet. Further, Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and Plaintiff's Marks have received unsolicited third-party recognition and acclaim.

39.     As a result of such advertising and attention, the public has come to recognize Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, which bears Plaintiff's Marks, as originating solely from Plaintiff.  Further, consumers also refer to Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as "Left Center Right".  This is also shown in Doc. 41-6 ¶¶111-50.[2]

## DEFENDANTS AND THEIR WRONGFUL ACTS

### Cardinal, Plaintiff's Licensee

40.     Cardinal is a former licensee, including without limitation by express written agreement, of certain of Plaintiff's Family of Marks and/or other intellectual property rights.

41.     On May 1, 2009, Plaintiff and Cardinal entered into a written licensing agreement (the "License Agreement") that provided, among other things, for the protection of Plaintiff's intellectual property rights, including one or more of the protected trademarks comprising Plaintiff's Marks.

42.     At the time Cardinal and Plaintiff executed the License Agreement, it was anticipated that sales of the product covered by the agreement would exceed $250,000.00 in the aggregate, because Cardinal would be expending substantial resources in manufacturing the product.  The parties would not have entered into the agreement had they not contemplated sales totaling at least $250,000.

43.     The License Agreement, inter alia, covered sales of the electronic version of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. Sales arising under the License Agreement in fact exceeded $250,000.00 and did so well before the filing of this action.  For example, two Cardinal invoices, which set forth royalties for the third and fourth quarter of 2010 due to Plaintiff from Cardinal for Cardinal's sales of the Electronic Plaintiff's Genuine LCR/LEFT

---

[2] References to specific paragraph numbers includes the figures referred to or exhibits cited to in the  paragraph cited herein.  ECF pagination is cited unless otherwise noted.

CENTER RIGHT Game under the License Agreement, show that total sales arising from transactions related to the License Agreement exceeded $250,000.00 in the aggregate, with total sales amounting to $282,192.00 by that point in time. Although the invoices display totals for "LCR Electronic Game", "LCR in Box", and "LCR Hand Held", these are all references to the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. *See* Cardinal invoices attached as **Exhibit "1"**, redacted for confidentiality and highlighted for ease of reference.

44. The License Agreement, attached in full as **Exhibit "2"**, contained the following pertinent provisions:

(a) defining "Property and Trademarks" as follows:

> **PROPERTY and TRADEMARKS :** The title, names, logos, trademarks, art work, photographs, of and associated with the dice Game "Left Center Right™" and the related marks and designs.

*Fig. 7*

(2) further providing:

> **Property.** Those particular designs and, identified on Exhibit A hereto, including adaptations thereof and additions thereto, and such other names and designs as may be designated by Licensor in writing to be used in connection herewith. . All Property is and shall at all times hereafter be, owned exclusively by Licensor. No Property is transferred from Licensor to any party by this Agreement.

*Fig. 8*

(3) defining CARDINAL INDUSTRIES as "**Licensee**"; and

(4) setting forth the following obligations by the Licensee, Cardinal:

> Licensee acknowledges that Licensor owns and has all right, good title and interest in the Property and that the same is **fully valid, subsisting and enforceable.**

*Fig. 9*

All proprietary rights and goodwill in the Property shall inure to the benefit of Licensor and not Licensee. Licensee shall acquire no property rights in the Property by reason of its use thereof, and if, by operation of law, or otherwise, Licensee is deemed to, or appears to, own any property rights in the Property, Licensee shall, at Licensor's request, execute any and all documents necessary to confirm or otherwise establish Licensor's rights therein. Licensee shall take no action in denigration of the rights of Licensor in the Property and Licensee will not in any way during this agreement and thereafter attack the Property.

*Fig. 10*

Copyrights. Licensee agrees to cooperate with Licensor in obtaining and preserving for Licensor copyright protection for the Property and executing all documents that, in Licensor's judgment, are necessary therefore and to maintain records (including invoices, correspondence and related material) of and, at Licensor's request, to advise Licensor with respect to, the publication dates of all adaptations, derivative works, new works and other works by Licensee utilizing the likenesses of any of the characters, scenes, or other elements contained in the Property. Licensee hereby sells, assigns and transfers to Licensor its entire worldwide right, title and interest in and to all such "new works," including, but not limited to, the copyrights thereon and Licensee agrees that, to the extent allowed by law, every such new work shall be considered a "work made for hire" for Licensor. Licensee additionally agrees when requested to do so by Licensor to aid Licensor in registering the copyrights, and

*Fig. 11*

to obtain design registrations where appropriate, for any such new works in Licensor's name and at Licensor's expense in all parts of the Territory which permit such registration. Licensee warrants that the use of such new works by Licensor or its licensees shall not infringe the rights of any person or entity. During and after the term of this Agreement, Licensee shall refrain from asserting, directly or indirectly, any interest or property right in any copyrights of Licensor which are the subject matter of this Agreement, or any adaptations or derivative thereof, and which are not in the public domain.

*Fig. 12*

> **Trademarks.** Licensee agrees to cooperate with Licensor in obtaining and preserving for Licensor trademark protection for the marks and/or names of the Property and any characters contained therein and executing all documents that in Licensor's judgment are necessary therefore and to maintain records of and, at Licensor's request, to advise Licensor with respect to use by Licensee of the name of the Property and the names of individual characters within the Property and to provide Licensor with such additional samples of said names as used on the Licensed Products, dates of first use and dates of first use in interstate commerce, and such materials and information as Licensor deems necessary to enable Licensor to apply for trademark registration for the name of the Property and characters in connection with all Licensed Products. Licensee further agrees to recognize Licensor's trademark rights in any name used in connection with the Property and the names of individual characters within the Property and to do nothing in derogation or dilution thereof, either during the term of this Agreement or at any time thereafter.

*Fig. 13*

> **APPLICABLE LAW.** The validity, construction and performance of this Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Florida. In any dispute relating to this Agreement, the parties hereto admit venue and submit themselves to the exclusive jurisdiction of the tribunals of the United States District Court for Middle District of Florida, expressly waiving any venue to which they may be entitled by their present or future domiciles.

*Fig. 14*

45.    In the License Agreement, as noted above, Cardinal and Plaintiff expressly bargained for and agreed to post-termination and post-expiration rights such that even after the License Agreement expired by its terms or was terminated Cardinal, as Licensee, was obliged to recognized and respect the Licensor's rights in any name used in connection with the Property (such as without limitation Left Center Right and LCR) and the names of the individual characters within the Property and to do nothing in derogation or dilution of such trademark rights "at any time thereafter."

46.    Under New York law, Plaintiff has an enforceable business interest in the rights granted under the License Agreement and the right to sue for the enforcement thereof in this Court.

47.    Although Cardinal agreed to above venue and jurisdictional provisions, it has steadfastly denied that the courts in Florida have jurisdiction over it in conformity with Florida

law and the United States Constitution, as have all of the other Defendants in this action save for Walmart. Cardinal has agreed, however, that it can be sued in New York, where it is domiciled.

48.    Cardinal and Plaintiff also had a separate agreement, aside from the License Agreement, whereby Cardinal agreed to distribute Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game; the existence of this separate distribution agreement between Cardinal and Plaintiff is also evidenced by Cardinal's explicit inclusion and disclosure of the same to Spin Master as part of the Stock Purchase Agreement through which Spin Master acquired Cardinal, as described below. *See* **Exhibit "3"**, relevant excerpts from the Stock Purchase Agreement, highlighted for ease of reference. By this separate distribution agreement, Cardinal enjoyed the exclusive right to represent Plaintiff's brand and to resell Plaintiff's trademarked products to Walmart and other selected national retailers.

**Spin Master's Acquisition, Merger,
and/or Constructive Merger with Cardinal**

49.    In 2015, some or all of Spin Master Corp; SM Holdings; Spin Master Ltd.; and Spin Master Inc. (collectively, "Spin Master") acquired, merged with and/or constructively merged with Cardinal (hereinafter the "Cardinal Merger").  The Cardinal Merger included the License Agreement.

50.    Before or at the time of the Cardinal Merger at the latest, Cardinal disclosed the License Agreement to Spin Master as well as the separate distribution agreement which it had with Plaintiff, under which Cardinal acted as an agent and reseller to Defendant Walmart as well as other national retailers.

51.    Joel Berger and his sister Bonner Berger Canner, the principal shareholders in Cardinal before the Cardinal Merger, were paid approximately fifty million dollars (USD $50,000,000.00), as a result of, or in connection with, in part or in whole, Spin Master's purchase

of Cardinal stock through which Spin Master acquired control over Cardinal.

52.     As the result of the Cardinal Merger, the Spin Master Defendants were in the position to control Cardinal in its representation of Plaintiff's brand to Walmart and other national retailers and to influence how Cardinal dealt with the retailers in respect to the advertisement, promotion and distribution of Plaintiff's LCR/LEFT CENTER RIGHT Game on the retailers' shelves, displays, and collateral marketing pieces, as well as the information recorded in the retailers' relational databases concerning Plaintiff's Game.

53.     After the Cardinal Merger, Cardinal eventually began to manipulate, subvert, and abuse the licensing rights afforded by Plaintiff, and the access to retail supplier customers arising therefrom, to displace Plaintiff's products, including in NewYork, with its own products, namely the infringing Cardinal/Spin Master dice game knock-off (the "Knock-Off") of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, and to act in derogation, denigration and infringement of one or more of Plaintiff's rights including, without limitation, Plaintiff's Marks. Cardinal did so on instructions from and in agreement with Spin Master. Furthermore, Spin Master utilized and continue to utilize Cardinal as their agent and alter ego to advertise, promote, and sell Spin Master products, and Cardinal acquiesced to the same.

54.     Although the Knock-Off is labeled as "PassPlay: The Game of LeftCenterRight", calling the Knock-Off "PassPlay" is a ruse, especially since the Knock-Off emphasizes "LeftCenterRight" and diminishes the size of "PassPlay", doing so to deliberately capitalize on the good will and customer recognition of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. Further, per the March 7, 2014, Statement of Use Spin Master Ltd. filed with the United States Patent and Trademark Office and associated with Reg. 4538769, "PassPlay" was only first used as of August 1, 2012, well after the Knock-Off had already been sold as "LeftCenterRight" for a

period of time. The game is not legitimately referred to as "PassPlay" and is not sold or passed off by Cardinal or Walmart as "PassPlay." It is sold and marketed as "LCR" and as LeftCenterRight in order to trade on the goodwill of Plaintiff and to cause confusion as to source or origin.

55.     Cardinal is fully aware of the obligations it has to Plaintiff. On December 22, 2016, after the Cardinal Merger, Cardinal, through Berger, made one of many efforts and representations, upon which Plaintiff relied, to assure Plaintiff that Cardinal's obligations to Plaintiff would be met, including assurances and commitments not to displace, switch or otherwise substitute Plaintiff's products with the Knock-Off, and transmitted copies of those assurances to third parties as well. An example is set forth below:

From: Joel Berger
Sent: Thursday, December 22, 2016 10:51 AM
To: 'peters@georgecolic.com' <peters@georgecolic.com>
Cc: 'Sausner, Alan' <Alan.Sausner@fivebelow.com>
Subject: FW: George & Company, LLC/Five Below, Inc., et al/LCR Left Center Right Dice Game by George & Company, LLC

Peter

I have made a commitment to you
Not to switch the major accounts Wal Mart Kohls etc
That We supply using your product
To Spins product

*Fig. 15 – Excerpts from Email from Cardinal to Plaintiff*

56.     The above referenced "commitment" not to switch major accounts shows that Cardinal fully-recognized that it was at the time still a significant representative of Plaintiff to major retailers like Walmart and that it had an obligation not to misuse its trusted position to disadvantage Plaintiff, whom it represented.

57.     The assurance given by Cardinal through Joel Berger proved to be an absolute lie. Despite the fact Cardinal had promised in the License Agreement, "*to do nothing in derogation or dilution*" of Plaintiff's intellectual property (which includes Plaintiff's Family of Marks), and

further promising that "*Licensee shall take no action in denigration of*" Plaintiff's rights in the Property, which includes Plaintiff's intellectual property (which includes Plaintiff's Family of Marks), Cardinal proceeded to do exactly what was prohibited by the License Agreement. Cardinal's prohibited acts, carried out with utter disregard for the obligations and commitments given to Plaintiff, included, without limitation,

1. manufacturing and branding merchandise bearing Plaintiff's Marks, including but, not limited to, the Knock-Off, including calling the Knock-Off "LeftCenterRight" and offering the Knock-Off for sale in packaging virtually identical to Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, including a rectangular metal tin, as shown further below;

2. communicating adversely to Plaintiff's customers and/or vendors concerning Plaintiff in derogation and denigration of Plaintiff's rights in Plaintiff's Marks;

3. conspiring with and aiding others to adversely impact Plaintiff's sales by misrepresenting Spin Master's rights in Plaintiff's Marks or by otherwise seeking to undermine Plaintiff's position with respect to the goods and/or services offered under Plaintiff's Marks;

4. making false representations in commerce as to it and Spin Master's ability to offer product bearing one or more of Plaintiff's Marks, or marks confusingly similar to one or more of Plaintiff's Marks;

5. failing to apprise other parties, customers, vendors, buyers, or the like, of the risk and liability to which its actions would expose said parties, which risk and liability was fully known to Cardinal;

6. failing to apprise other parties, customers, vendors, buyers, or the like, of the risk and liability to which its actions would expose said parties, and thereby subjecting other parties to liability to Plaintiff which may further give rise to indemnity obligations on the part of Cardinal or Spin Master;

7. placing a number of other parties at risk for liability to Plaintiff in connection with Cardinal's wrongful acts;

8. advertising and offering for sale competing versions of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, or contributing to the same, in derogation and denigration of Plaintiff's Marks and

Plaintiff's rights, precisely as is proscribed by the License Agreement;

9. undertaking, or contributing to, a systematic and constant illegal effort to prejudice retailers, vendors, customers, suppliers and the like who carried Plaintiff's products, destroy Plaintiff's longstanding business relationships with retailers, vendors, customers, suppliers and the like, and remove Plaintiff's products from availability for sale at various retailers and vendors by directly replacing those products with Cardinal and Spin Master products, in violation of the License Agreement between the parties as well as federal law protecting Plaintiff's intellectual property, including, without limitation, Plaintiff's Marks;

10. contributing to the direct infringement of Plaintiff's Marks and rights by retailers, vendors, customers, suppliers and the like or placing retailers, vendors, customers, suppliers and the like at risk of infringement of Plaintiff's Marks;

11. In one of many examples, illegally inducing retailers, vendors, customers, suppliers, and/or the like, to illegally use one or more of Plaintiff's Marks on, or in conjunction with, merchandise that is not genuine, authentic, or original to Plaintiff, including incorporating usage of one or more of Plaintiff's Marks, regarding which Plaintiff is and has always been, the only lawful user;

12. making and spreading unlawful and false communications concerning its purported rights in Plaintiff's Family of Marks, falsely claiming that Spin Master has won in prior legal battles the right to one or more of Plaintiff's Marks, which has never occurred;

13. when spreading the false and illegal information set forth above, failing to disclose that Spin Master has lost four subsequent legal proceedings before the United States Trademark Trial and Appeal Board all instituted by Plaintiff based on a likelihood of confusion arising from Plaintiff's trademark rights and Plaintiff's LEFT CENTER RIGHT brand. Specifically, Cardinal has failed to disclose to retailers, vendors, customers, suppliers and/or the like, that Cardinal and Spin Master's use of Plaintiff's LEFT CENTER RIGHT and related marks has *already been determined* to be likely to cause confusion with the Plaintiff's Marks in four separate legal proceedings. These four prior adjudications on the merits, are of even greater weight under the United States Supreme Court precedent in *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct. 1293 (2015), which provides that decisions of the United States Trademark Trial and Appeal Board are determinative in subsequent

civil proceedings in federal court;

14. failing to disclose to retailers, vendors, customers, suppliers and/or the like, that Spin Master's asserted application for LEFT CENTER RIGHT, or variations thereof, was refused and judgment was entered against Spin Master, in favor Plaintiff by the United States Trademark Trial and Appeal Board on July 16, 2013, in these four cases:

   (1) Prior Proceeding No. 1: A prior proceeding before the United States Trademark Trial and Appeal Board, resulting in the denial of Spin Master's then applied-for mark **LEFT CENTER RIGHT**, and permanent judgment entering against Spin Master on the grounds of likelihood of confusion with Plaintiff's trademark rights;

   (2) Prior Proceeding No. 2: A prior proceeding before the United States Trademark Trial and Appeal Board resulting in the denial of Spin Master's then applied-for mark **LEFT, RIGHT AND CENTER**, and permanent judgment entering against Spin Master on the grounds of likelihood of confusion with Plaintiff's trademark rights;

   (3) Prior Proceeding No. 3: A prior proceeding before the United States Trademark Trial and Appeal Board resulting in the denial of Spin Master's then applied-for mark **LEFT RIGHT**, and permanent judgment entering against Spin Master on the grounds of likelihood of confusion with Plaintiff's trademark rights; and

   (4) Prior Proceeding No. 4: A prior proceeding before the United States Trademark Trial and Appeal Board resulting in the denial of Spin Master's then applied-for mark **LEFT RIGHT DICE GAME**, and permanent judgment entering against Spin Master on the grounds of likelihood of confusion with Plaintiff's trademark rights;

15. importing, or contributing to the importation of, the Knock-Off falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, including labeling the Knock-Off imports as "LCR" and with Plaintiff's UPC/shipping code, examples of which are shown at Doc. 58-3 to 58-8;

16. distributing or otherwise making available Cardinal/Spin Master products under Plaintiff's uniform product code ("UPC") or other proprietary product codes of the Plaintiff, causing confusion, and/or

the likelihood of confusion, or contributing to the same, for example in the images below:





*Fig. 16 - The left image shows Plaintiff's dice game for sale at a Walmart store in Naples, Florida; note that the product hanging immediately behind Plaintiff's dice game is the Knock-Off. Evident in the left image as well as the image on the right is that the Knock-Off is marketed and offered for sale under a shelf tag bearing Plaintiff's unique UPC code for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, 76663100119, well as Plaintiff's incontestable LCR® mark.*



*Fig. 17 – the Knock-Off intermixed with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at a Florida Walmart Store in December 2017*



*Fig. 18 -  Knock-Off that Cardinal has imprinted with Plaintiff's UPC and then covered with a sticker bearing Cardinal's UPC*



*Fig. 19*



*Fig. 20*

*Figs. 19 & 20 - Six units of the Knock-Off purchased on Dec. 8, 2018, at a Naples, Florida Walmart store in shipping box that Cardinal labels falsely as containing LCR and with the Genuine LCR/LEFT CENTER RIGHT Game's UPC/shipping container barcode. Examples of the same from June 2018 are found at Doc. 41-6 ¶¶18-19.*



*Fig. 21 – Knock-Off available for purchase on Dec. 28, 2018, in the six-unit shipping box in which they were shipped to the Walmart store in Naples, Florida; Cardinal's shipping box falsely identifies the Knock-Off as LCR and uses Plaintiff's UPC/shipping container barcode*



*Fig. 22 – Knock-Off falsely labeled with the UPC of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game; this Knock-Off was delivered by Walmart.com from the seller, Walmart, to fulfill an order placed for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, ordered on Walmart.com from Walmart as the seller.*

17. illegally affixing both Cardinal and Spin Master's name, together, on products used to further the illegal acts of Cardinal described herein, such as is shown below:



*Fig. 23*



*Fig. 24*



*Fig. 25*

(5)   working with Spin Master Inc.'s employees to ensure the infringing sale of the Knock-Off at various retailers continued;

(6)   causing or contributing to Walmart.com fulfilling orders placed on Walmart.com, with Walmart as the seller, for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to be fulfilled with the Knock-Off, falsely identified as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game instead of being fulfilled with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. *See* Doc. 41-1 ¶74; Doc. 41-4 ¶¶7-9; Doc. 41-6 ¶¶26-39.

18. GS1 is a private organization that issues a unique "company prefix" that composes the first six-digits of a product's UPC. As noted above, Plaintiff's UPC for its blue metal tin version of its Genuine LCR/LEFT CENTER RIGHT Game is "76663100119". This includes Plaintiff's company prefix, "766331". Doc. 41-3 at 33.

19. As Cardinal has admitted, a company prefix is "a unique number issued by a private organization called GS1, to the company that is the source or "brand owner" of the associated product[.]" Doc. 68-2 ¶25.

20. A search using GS1's UPC database, located at https://www.gs1us.org/tools/gs1-company-database-gepir, for "Cardinal Industries" confirms "047754" is the source company prefix for Cardinal Industries, contrary to any claims otherwise. *See*, *for e.g.*, Doc. 68-2 ¶36 (claiming the prefix is Spin Master Ltd.'s own company prefix). A January 3, 2019, screenshot of the results of such a search is shown below:

| Entity GLN | U.P.C. Company Prefix | GS1 Company Prefix | Company |
|---|---|---|---|
| filter | filter | filter | filter |
| 0047754528756 | 047754 | 0047754 | Cardinal Industries Inc. 3030 47TH AVE STE 680 LONG ISLAND CITY, NY 11101-3438 US |

*Fig. 26*

21. At times, aside from the Knock-Off being associated with or labeled falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, Cardinal also, through itself or by enabling others, altered the UPC associated with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

22. For example, this is seen with units of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game for sale at Kohl's that had the UPC of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game obscured with adhesive labels identifying Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game with a UPC bearing Cardinal's company prefix, "047754":



*Fig. 27*

23. In order to successfully place the Knock-Off for sale with retailers, Cardinal initially deceived the retailers into believing the Knock-Off was Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, including by introducing the Knock-Off as "LCR" to the retailers.

24. For example, in order to successfully switch-out Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at Walmart with the Knock-Off, Cardinal initially deceived Walmart, including by associating the Knock-Off's UPC with the entry for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in Walmart's product database, known as Retail Link ("Retail Link").

25. At some point in time, at least several of the retailers buying the Knock-Off from Cardinal, including Walmart, began to actively participate in the infringement of Plaintiff's Marks

26. A specific example of a retailer actively participating in the infringement of Plaintiff's Marks and engaging in direct infringement is found in the case of Walmart as illustrated in Cardinal's testimony in the affidavit of Joel Berger, Doc. 68-2, attached hereto.

27. While Walmart may have been initially confused at Spin Master's attempt to sell the Knock-Off, likely in a tube version, to Walmart as of the summer of 2017 (while Cardinal was still distributing and selling Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to Walmart), Walmart ultimately acquiesced, knew, and agreed with Berger, as he testified on behalf of Cardinal, that Walmart would be selling out all its inventory of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and would then be selling a tin-version of the Knock-Off instead.

28. Despite this knowledge, Walmart did not make appropriate changes to Retail Link, including deleting entries for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in Retail Link to reflect that Walmart would no longer be carrying Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game or requiring Cardinal to create a unique Retail Link entry for the Knock-Off that was not connected

to Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in any way prior to the commencement of the sale of the Knock-Off in Walmart stores. This ensured that the Knock-Off would be sold falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to consumers as it was intermingled with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, on the same shelf hangers and identified under the shelf-talker that had been created for and had been used exclusively to identify and sell Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at Walmart stores, as shown in figures herein.

29. Because Cardinal switched-out Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game with the Knock-Off, with Walmart's approval and knowledge, without creating a new item entry in Retail Link for the Knock-Off, and Walmart allowing the same, Walmart began receiving emails from various store locations complaining that the Knock-Off was not recognized as an existing product in Walmart's systems such that it would not scan when customers attempted to purchase the Knock-Off. *See* Doc. 58-2 ¶15; Doc. 68-2 at 60-61; Doc. 68-2 ¶¶ 36-37.

30. Due to this confusion, Walmart directed Cardinal to create a new entry in Retail Link for the Knock-Off and to associate the Knock-Off entry, falsely, with the entry for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game so that the Knock-Off could be scanned,

i.e. recognized as a product properly for sale in Walmart stores, when customers attempted to purchase the Knock-Off at Walmart stores. *See* Doc. 68-2 at 60-61; Doc. 68-2 ¶¶36-40. Walmart, therefore, allowed Cardinal to manipulate its Retail Link database to falsely associate the Knock-Off with and as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, including allowing Cardinal to identify the Knock-Off as "LCR" and connect it with the UPC for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. This ensured the Knock-Off would be identified falsely to retailers as "LCR" on shelf-talkers, in product scanners, and on sales receipts generated by sales of the Knock-Off. By engaging in this conduct Walmart was no longer a passive victim of a scheme to engage in passing off and other acts of unfair competition and trademark infringement but actively engaging in infringement, and doing so because Cardinal, its former supplier of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, was selling it the Knock-Off for a cheaper price.

31. Cardinal proceeded to create with Walmart's permission a new, unique Retail Link entry for the Knock-Off, falsely identifying it as "LCR in Tin Game", which entry and description Walmart approved on December 28, 2017. Doc. 68-2 ¶¶37-39; Doc. 58-13 at 9 (record of Retail Link entries and changes thereto for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as well as for the Knock-Off,

including creation of first entry for Knock-Off as Item #567010809); Doc. 58-12 ¶¶5, 9-10.[3]

32. Cardinal created a second entry for the Knock-Off in Retail Link, again falsely identifying it as "LCR TIN", which Walmart approved on January 16, 2018. Doc. 58-12 ¶¶11-12; Doc. 58-13 at 9.

33. Walmart generated shelf-talkers identifying the Knock-Off falsely as "LCR" to Walmart customers and associating the Knock-Off with Plaintiff's UPC for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, as a result of Cardinal's intentional decision to pass-off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at Walmart by falsely labeling it as "LCR TIN" and "LCR in Tin Game", which Walmart approved. For the same reason, the Knock-Off was intermixed with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in Walmart stores, hanging on the shelf hangers and identified with the same shelf-talkers.  For the same reasons, Walmart receipts for purchases of the Knock-Off also falsely identified the Knock-Off falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. For the same reasons, Walmart store scanners, including those provided by Walmart for customer use, identified the Knock-Off falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.  Doc. 41-4 ¶¶5-16;

---

[3] Walmart has even allowed and approved changes by Cardinal, without authorization from Plaintiff, to the Retail Link entries for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, changing the description of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game from "LCR TIN" to "LEFTCTRRIGHT", the same description the Knock-Off was eventually given in Retail Link in September 2018. Doc. 58-12 ¶¶7, 16-17.

Doc. 41-1 ¶¶50-51, 66-69; Doc. 41-6 ¶¶14-18, 21; Doc. 41-10 ¶¶4-9,11,14.

34. Through its actions, Walmart knowingly delivered and sold the Knock-Off falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in New York across its New York Walmart retail store locations and continued to do so even after commencement of this litigation and after knowing that the Knock-Off was not Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

35. To this day, Walmart continues to sell the Knock-Off in retail store locations across the nation as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

36. Walmart became a witting party to the infringement, as shown above, as did other retailers with retail stores in this District and Division whom Cardinal persuaded to sell the infringing Knock-Off.

37. At about the time the game was switched out at Walmart, and continuing through the present, Cardinal's parent, Spin Master Ltd., through www.spinmaster.com, also copied Plaintiff's federally registered marks including the distinctive exclamation points between each word of LEFT! CENTER! RIGHT!, which is specifically covered and protected by Plaintiff's trademark registrations for LCR LEFT! CENTER! RIGHT! and design (Reg. 4519608) and LCR LEFT! CENTER! RIGHT! and design (Reg. 5091343) to promote versions of the Knock-Off on Spin Master's

website. This promotion was part of an effort by both Cardinal and Spin Master to enable Cardinal to appropriate and trade on Plaintiff's good will and consumer recognition. Examples are shown below:



*Fig. 28* – found at: http://spinmastergames.com/game-detail.php?pid=p10301



*Fig. 29* – found at: http://spinmastergames.com/game-detail.php?pid=p10422

38. Spin Master's website also directed, and continues to direct, customers to purchase the Knock-Off online and at retailers with nationwide distribution as seen in this screenshot of the page, http://spinmaster.com/product_detail.php?pid=p10422, from the website:



*Fig. 30*

39. Spin Master engages in conduct of the type described above to aid and abet Cardinal in its infringement.

40. In fulfilling online orders for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, purchased on Walmart.com from Walmart itself as the seller, Walmart, as noted above, shipped out the Knock-Off instead of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. In addition, Walmart identified the Knock-Offs it shipped to

fulfill such online orders falsely as "LCR", including in the invoices inserted with the shipments. *See* Doc. 41-6 ¶¶26-39. Walmart did so without the permission of the customers, delivering a deceptively similar game to the consumer. In doing this Walmart was effectively implying a connection or association or affiliation between the source of the Genuine LCR/LEFT CENTER RIGHT Game, which the consumer had requested, and the Knock-Off, which the consumer received, which connection or association or affiliation did not exist.

41. Walmart also allowed the listing on Walmart.com for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, through which Walmart continued to advertise that Walmart itself sold Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, directly to online consumers, including New York consumers, to be falsely manipulated by Cardinal, or a Cardinal affiliate, or acquiesced or contributed to the same. This manipulation included changing, without authorization, the image of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game on the listing to a picture of the Knock-Off and changing the description of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, without authorization, from "The Original LCR Left Center Right™ Dice Game" to "Classic Left Center Right Game in a Tin". Once Plaintiff alerted Walmart to these unauthorized changes, Walmart reversed them, but, shortly

thereafter, on the same day, the same unauthorized changes were made again. When Plaintiff brought this to Walmart's attention again, Walmart appeared confused and stated it had to "play detective" and "speak to Cardinal to find out" what was going on. Eventually a separate Walmart.com listing was created for the Knock-Off. Despite this litigation and knowing better, Walmart continues to this day to promote the Knock-Off on <u>Walmart.com</u> as <u>for sale in Walmart stores, including its New York retail locations, and as</u> featuring dice "marked with L,C,R", which is not the case and has never been the case with the Knock-Off and amounts to falsely identifying the Knock-Off as and associating it with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.



We aim to show you accurate product information. Manufacturers, suppliers and others provide what you see here, and we have not verified it. See our disclaimer

Shake up your next game night with the Left Center Right Game in a Tin. This classic dice game is fun for the whole family and comes with a convenient storage tin so you dont lose your pieces. Players take turns to roll the six-sided dice, each of which is marked with L, C, R on one side, and a single dot on the three remaining sides. For each L or R thrown, the player must pass one chip to the player to their left or right. A "C indicates a chip to the pot in the centera dot has no effect. When a player has no chips, he passes the dice on his turn, but may receive chips from others and take his next turn accordingly. The last player to have any chips is declared the winner.

- The classic dice game that never gets old
- Comes with convenient storage tin
- For 3 or more players
- Ages 5 and up
- Includes: 3 dice, 24 playing chips, bag, storage tin, instructions

## Specifications

| Brand | Cardinal Games |
| --- | --- |

*Fig. 31*
*Screen shots of Walmart.com listing of Knock-Off with product description falsely promoting Knock-Off as containing LCR dice; Walmart claims this information is provided solely by manufacturers, suppliers, or the like, i.e. Cardinal with respect to the Knock-Off.*

42. When Walmart also shipped six-unit boxes of the Knock-Off, which boxes were and are available for purchase on retail shelves at its Walmart stores, Walmart also identified the contents of these boxes, i.e. the Knock-Off, falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game by labeling the contents of the boxes as "LCR" on the shipping label and using the UPC for Plaintiff's GENUINE LCR/LEFT CENTER RIGHT Game on the shipping label too. *See* Doc. 41-6 ¶¶18-23.

43. Defendants' acts as alleged herein caused or contribute to, and are likely to continue to cause or contribute to, confusion among the public and specifically the relevant consuming public, including in this District and Division.

44. The infringing acts include the sale of the Knock-Off in over 2,000 retail locations across New York, including in this District. Cardinal facilitated the infringing sale of the Knock-Off in part by working with the New York employees of its sister-subsidiary company, Spin Master Inc.

45. The "Job Overview" Spin Master provided reads:

Retail Sales and Merchandising Reps are an essential component of Spin Master's supply chain. Ensuring that we are best positioned to maximize our share of shelf is critical. Developing strong working relationships with our Retail partners, both staff and management, is critical. Our Retail Merchandising team works hard to ensure that our products are available on-shelf, at the right location and at the right price. Writing orders and securing incremental display space are value added activities that foster our success.

Doc. 67-1 at 112.

46. The duties of the position include, inter alia, ensuring the Knock-Off is for sale and arranged on retailer shelves according to planograms,[4] ensuring the Knock-Off is priced and tagged correctly, assembling/setting-up promotional displays or endcaps, "ensuring all signage is correctly set-up and displayed," "Writing Direct To Store orders in Walmart", and "Reporting on low stocks and no stocks." *See* Doc. 67-1 at 112.

47. Cardinal was well aware of prior litigation between Plaintiff and Spin Master Ltd. and its predecessor in interest, Imagination Games, which litigation even included a consent injunction from a federal

---

[4] Planograms for the Knock-Off at Walmart, for example, falsely described and identified it as "LCR". *See* Doc. 41-4 ¶¶11-12.

court in California prohibiting acts of infringement by Imagination Games and its affiliates, including using a confusingly similar mark to Plaintiff's Marks. That injunction order and its stipulation is included in Doc. 41-2, Ex.11.

48. Knowing these facts, Cardinal elected to participate in or contribute to the infringing sale, distribution, and licensing of the Knock-Off to retail customers in New York for the purpose of trading upon the good will of Plaintiff and for willfully infringing or contributorily infringing Plaintiff's Marks.

**A Pattern of Abuse of Plaintiff's Rights**

49. Spin Master's predecessor in interest with respect to the same products now at issue, Imagination Games, has previously infringed more than one of Plaintiff's Family of Marks.

50. In stark contrast to Plaintiff's long term and innovative successes, Spin Master's predecessor in interest and its related companies were large, global businesses with a history of trading off of the goodwill and innovative efforts of smaller businesses like Plaintiff.

51. In 2007, those entities introduced their own version of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, which they, like Plaintiff, also branded as LEFT CENTER RIGHT. The game play, rules, packaging and title of that dice game were virtually identical to that of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game. In fact, those entities admitted that they purchased and studied

Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and that it was used as a prototype by those entities prior to the manufacture of their "Left Center Right" game.

52. In May 2007, Plaintiff filed suit against certain defendants in the Eastern District for the State of Virginia alleging that those defendants' use of the mark "Left Center Right" on the packaging of the infringing dice game and in advertisements constituted trademark infringement (the "EDVA Action").

53. The EDVA Action was disposed of by a determination, **not** that the defendants had *any* rights in Plaintiff's Marks, but instead that Plaintiff's one singular mark LEFT CENTER RIGHT, mark had not yet (at that time), in the particular limited geography of the then pending proceeding, acquired *secondary meaning*. Plaintiff's mark has since acquired secondary meaning, and further there have been four subsequent legal proceedings by Plaintiff against Spin Master which have each and all been adjudicated in Plaintiff's favor and against Spin Master by the United States Trademark Trial and Appeal Board. Spin Master argued in each of those four cases that the determination of the EDVA case had some bearing on the matter, but Spin Master's argument in that regard was summarily rejected.

54. Prior to that time, those entities escalated their efforts to trade off of Plaintiff's goodwill and pass off their products as Plaintiff's. It is an undisputed fact that those entities began advertising an infringing

dice game using one or more of Plaintiff's Family of Marks, including the mark "LCR" alone, to sell infringing merchandise. Those entities' use of "LCR" to advertise their dice game is set forth below, as only one example:



*Fig. 32*

55. Remarkably, those entities' attempts to deliberately confuse their dice game with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in the mind of the public did not stop with infringing Plaintiff's Marks. Beginning on or about December 2009, those entities took and misappropriated testimonials which belonged to *Plaintiff,* and arose from *Plaintiff's* customers, and were about *Plaintiff's* dice game, and which had appeared in *Plaintiff's* advertisements (the "Testimonials") and incorporated those testimonials, virtually verbatim, into those entities' infringing advertisements. Those entities had simply changed the Testimonials

in order to pass the Testimonials off as their own. Those acts were the subject of a subsequent lawsuit, for which, not surprisingly, judgment was ultimately entered against those entities.

56. In addition, beginning at the New York Toy Fair of 2009, those entities distributed their 2009 product catalog in which they falsely advertised to the public that their dice game was "the original" "Left Center Right" dice game, which it is not. Those entities also implemented packaging, claiming to be the "original", which they are not. Those efforts to claim "originality" were also made the subject of a lawsuit by Plaintiff, and were, not surprisingly, corrected and prohibited by subsequent judgment.

57. Spin Master Ltd. acquired multiple games from Imagination Games in an asset purchase in August 2010. Doc. 68-1 ¶4; Doc. 58-11 (assignment of interest and goodwill in trademarks from Imagination to Spin Master Ltd. filed with PTO). At the time, Spin Master was only selling the Knock-Off as a tube version, as shown below:



*Fig. 33*

58. Cardinal only created a tin-version of its Knock-Off after it decided to pass-off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at Walmart, which required the Knock-Off to have the same form-factor as the blue tin version of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game that was sold at Walmart and which blue tin format was designed at Plaintiff's behest and instructions, as a result of Berger and Peter Smilanich collaborating in 2010.  *See* Doc. 41-2 at 70-74.

59. Cardinal continues to this day, directly or in a contributory capacity,

to advertise, sell and offer for sale products bearing Plaintiff's Marks and the UPC Code for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, as well as using and inducing others to use Plaintiff's Marks, including "LCR", and the UPC Code for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in total violation of Plaintiff's rights in this District and Division, as shown in the following examples:



*Fig. 34 – Knock-Off sold as LCR in Walmart store in Florida as of October 12, 2018, as well as identified by Plaintiff's UPC Code for the Genuine LCR/LEFT CENTER RIGHT Game*



*Fig. 35 – Knock-Off for sale at Walmart in Florida; the adhesive label bearing the Knock-Off's actual UPC is removed, revealing the Knock-Off is imprinted with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game's UPC.*






*Fig. 36 – Knock-Off version touted as having "LCR" dice at Kohl's in Naples, Florida as of November 10, 2018*





*Fig. 37 – "Giant" version of the Knock-Off sold at Staples as "LCR DICE GAME" in November & December 2018*



*Fig. 38 – Dollar General in Florida*



*Fig. 39 – Big Lots selling Knock-Off as LCR*





*Fig. 40 – Knock-Off shipped to Walmart in boxes that Cardinal labels falsely as containing LCR and with the Genuine LCR/LEFT CENTER RIGHT Game's UPC/shipping container barcode*



*Fig. 41*



*Fig. 42*



*Fig. 43* – Family Dollar store in Naples, Florida selling and identifying the Knock-Off falsely as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.





*Fig. 44 – Family Dollar receipt and packaging falsely identifying Knock-Off's purchased as "LCR"*

60. Cardinal has at all times understood that the mark "LCR" is owned and controlled exclusively by Plaintiff, and no other.

61. For example, Berger wrote correspondence on December 22, 2016, stating "*LCR is a trademark of George and CO*".



*Fig. 45*

58.     Further, Cardinal has already agreed various marks owned by Plaintiff, including "[t]he trademarks . . . of and associated with the dice Game 'Left Center Right™, and the related marks and designs" were "valid, subsisting, and enforceable[,]" and that Cardinal would not harm the same.   Doc. 41-2, 22-27, 33-34. Those marks include LCR, "Left Center Right", "LCR Left! Center! Right!" and design, and "Left, Center or Right – Don't lose your chips!", as well as "adaptations thereof and additions thereto, and such other names and designs as may be designated by [Plaintiff] in writing to be used in connection herewith."  Doc. 41-2, 22, 24, 33-34.

**SOME FACTS FOR FRAUD IN THE INDUCEMENT**

59.     Sometime in 2004, Cardinal inquires, about licensing George and Company game in the attempt to lure George and Company into an agreement to which George and Company  later, learned to use its game in order to profit with another company in a letter.

60.     Sometime thereafter, Cardinal produces UMD Dice Game, a copy of the George and Company game.

61.     Around 2008, Cardinal inquires George and Company about licensing an Electronic Version of LCR/Left Center Right Game only.

62.     George and Company then execute a licensing agreement with Cardinal for an Electronic Game in a written contract.

63.     Cardinal presents Electronic Game to Walmart, etc.   And Joel Berger, a representative of Cardinal says in a phone conversation "Walmart wants our Original LCR / Left Center Right Dice Game too."

64.     George and Company agrees to let Cardinal represent them with Walmart for the original LCR / Left Center Right dice game, in a phone conversation.

65.     The specific terms of this agreement were detailed in emails between the parties.

66.     In 2010, Cardinal produces the Electronic Game at their factories and supplies vendors from their warehouses.

67.     George and Company produces the Original Dice Game (Blue Tin) at a factory in China and initially ships direct in container to Cardinal warehouse in NY to supply their accounts i.e. Walmart, Kohls.

68.     George and Company has an Agreement with Cardinal to purchase (Blue Tin) by container loads for a set price per unit.  These are purchased in Master Cartons of 12 pieces.

69.     Walmart starts ordering and the first PO (PO = purchase order) number is 15653 and it is placed by Cardinal on 4/30/2010.

70.     The shipment arrives to Cardinal on or around 7/14/2010.

71.     An actual hard copy of PO 15653 is received by George and Company.

72.     Everything seems to be going per the contract except for some slow paying of invoices by Cardinal.

73.     George and Company is no longer receiving hard copies of PO's, Usually, just an email with a PO numbers and instructions in a less formal manner from Cardinal.

74.     George and Company sends communication via email to Joel Berger.  George and Company states that he heard rumors of you possibly selling your business in an email dated 3/9/2015.

75.      Shortly thereafter in the same, Peter Smilanich of George and Company received a phone call from Joel Berger and he tells him that there are two interested parties. One being Spin Master and "He will keep me posted."

76.     On 3/26/2015, Donna Frankel of Cardinal has a new packaging request for Blue Tins.  It is now increased to 48 pc. Masters 8 inner of 6 pcs.

77.     On 4/8/2015, George and Company creates new bar codes for 48 Master ctn and 6 pc. Inners per email by George and Company on same date.

78.     On 10/30/2015, Peter Smilanich of George and Co reaches out to Joel Berger.   He asks, "Are you available to talk?"

79.     On 10/30/2015, Peter has a phone conversation with Joel.  Joel Berger says, "he ended up selling to Spin Master," but that he promises that he will be staying on and that there will be "no change" with their arrangement for 5 years, maybe longer.

80.     On 1/30/2016, George and Company ships new orders to California at Goldstein's request.

81.     On 2/4/2016, a new PO 4500195712 came for a potential 40' container provided in an email from Goldstein.

82.     On 2/5/2016, Goldstein asks in a message to reduce the order because "Spin wants to keep inventory a bit tighter than Joel."

83.     This alerted George and Company because it was not really the true volume dealt with in the past, and was a misrepresentation for several reasons, including Joel's promise to keep

control of the product rather than Spin Master.

84.     On 5/27/2016, Goldstein asks about putting their Uniform Product Code (UPC) on George and Co. Blue Tin and George and Company tells him that that is only to be put on our products because this would be a misrepresentation.

85.     On, 9/25/2016, Goldstein inquires on a date for delivery to ship to Carson, California for a 20' container of #119 and Peter Smilanich of George and Company tells him that he can ship by Nov 11, 2016.

86.     On 9/28/2016, Spin Master asks for George and Company to supply them with LCR dice to complete some Spin Master orders in Mexico.

87.     At this point, Cardinal and Joel Berger were planning to counterfeit the LCR product by producing it themselves. George and Company learned of this in December 2017, when they saw the game being marketed.

88.     This means Spin Master wanted to take over the entire game from George and Company in contravention to the agreement.

89.     George and Company denies their request to supply the LCR dice to Mexico because LCR is the registered trademark of George and Co.

90.     Again, it seems Joel's promise to keep control no longer stands were appearing to not be made by Joel Berger.

91.     On 9/29/2016, after George and Co. does not allow them to take over the product, Goldstein holds on placing order for now of Item #119 to California.

92.     George and Company tells them of his busy schedule with China and needs more time to manufacture the product and ship it. Goldstein seemed to understand and said he would place an order to ship 2/21/2017, once the Chinese New Year holiday (CNY) was over.

93.     During the CNY, the Chinese factory shuts down all production and work for several weeks.

94.     On 10/5/2016, Peter Smilanich of George and Co suggests to ship before CNY.

95.     On 10/12/2016, Peter contacts Goldstein.  Again, Peter tells him about scheduling and shipment times. Goldstein says, "gonna wait on this for now."   Goldstein further says that he heard of updating the artwork.

96.     Peter Smilanich asks, "Updating the artwork on the outer carton?" and Goldstein responds: "No updating the TIN." This is a change to the actual product.

97.     On 10/13/2016 Peter Smilanich contacts Joel about cancellation of order for 2/21/2016 and artwork change question.  Joel claims he knows nothing, but will check. Joel says only licensed items change art, not this.  This lead to suspicion of Joel losing control by Peter Smilanich.

98.     On 10/28/2016, George and Company send a reminder to Goldstein and Joel Berger that the factory in China needs 6-8 weeks production time and 2-3 weeks delivery time. Now Goldstein says; "Looking at demand, good through July 2017 with current on hand situation."

99.     On 11/29/2016, Goldstein says Cardinal needs to order 20' container for California to arrive around 4/1/2017.

100.    On 12/2/2016, George and Company tells them it can be ready by March 7, 2017.

101.    On 12/8/2016, George and Co. tells Goldstein we need a PO number and instructions for packing and that we need to work around CNY.

102.    Goldstein says; "Going to wait a bit longer to place order" …   "Thinks maybe for April 15, 2017"

103.    Peter Smilanich of George and Co suggests, if he knew the packaging, we can have

ready to ship.

104.    Goldstein agrees, and says he will cut a PO. He does with PO #4500229303.

105.    George and Company learned later that this was the last order for US deliveries. No delivery address was given because Goldstein states the warehouse might be moving from Long Island.

106.    On 3/20/2017, George and Company sends Goldstein a message asking for a delivery address.  Goldstein states he needs to delay shipment due to moving to new facility.  He now says that the shipment should delay leaving China factory until 4/24/2017.

107.    On 5/12/2017, George and Co. notifies Goldstein of May 14 arrival of shipment from China.

108.    On 5/25/2017, George and Co. inquires about Kohls.

109.    At this point, George and Company learns that a different sticker was put on their product without the consent of George and Company.

110.    George and Company learns this because he says it did not make this sticker change, but that it was either Spin Master or Cardinal.

111.    Asks about providing LCR with different sticker. George and Co. says no, it does not sticker for Kohl's because they did in-house per Goldstein.

112.    On 6/28/2017, George and Co., checking in on inventory with Goldstein, says that he's good up to December. He says he will place new order around Aug 1, 2017.

113.     Peter of George and Company asks if he can forecast a 20' or 40' order for November, so that he can plan ahead.

114.    He also asks what Goldstein is doing for the Kohl's account?  Goldstein replies; "A 40' for Nov. 2017,"  and admits again they did re-packing for Kohl's in house.

115. On 8/11/2017, George and Co. asks Goldstein about this November shipment again.

116. He asks how it would be packed because he wants to be prepared. But, told to hold, Goldstein needs to look at inventory situation because they are watching inventory levels.

117. On 9/05/2017, Goldstein send an email to check on inventory levels. George and Co. states that they need to give the factory enough time for printing and production. Goldstein replies; "Need a couple of days."

118. On 9/16/2017, George and Company again contacts Goldstein to check on inventory, without reply.

119. On 9/20/2017, George and Company again contacts Goldstein to check on inventory. George and Co. says time is getting short for a November 15th shipment. George and Co. copies Joel Berger.

120. Mike Goldstein responds that Kohl's was re-packed in-house and Walmart, now good through January 2018 based on forecast. Goldstein says that they haven't run purchasing requisition for Feb. yet.

121. On 11/8/2017, George and Company contacts Goldstein to check on inventory because George and Company needs to schedule around CNY; no reply received from Goldstein.

122. 11/21/2017, George and Co. contacts Goldstein. George and Company says "It's been 2 months. Have you run your purchasing requisition for Feb. yet?" No reply again.

123. 11/22/2017, George and Co. contacts Joel. George and Co. tells Joel that they have been trying to get a response from Goldstein on inventory for Walmart in US. Joel says he will follow up.

124. 11/28/2017, George and Co. finally gets a response from Goldstein. He asks for a phone number so Joel can reach Peter Smilanich. On 11/29/2017, I give him one and a good time

to reach me. No call or response from Joel.

125.    11/30/2017, George and Co again contacts Goldstein. Tell him I did not hear from Joel Berger. Maybe we can connect tomorrow around 11:00 am. No reply.

126.    On 12/7/2017, George and Co. contacts Goldstein. Any updates on Walmart inventory? No reply.

127.    This entire plan was to steal the LCR and to mislead George and Company and this made it impossible to have another distributer rather than Joel for Walmart.

128.    Joel Bergner did that so that Spin Master could make the knock off and supply Walmart directly instead of George and Company supplying Walmart.

129.    George and Company never got a response on any questions and never heard from Joel again.

130.    On 12/8/2017, Goldstein emails asking about purchase order for Canada rather than the US (if it is going to be on delivered on time), but this was later cancelled.

131.    In about December of 2017, George and Co. found out about the counterfeit game by observing them at Walmart.

**INJURY TO PLAINTIFF AND THE PUBLIC**

132.    Defendants' acts as set forth herein are likely to cause (and do cause) confusion, mistake, and deception as to the source or origin of Plaintiff's goods, the origin of the Knock-Off, the activities of Cardinal, and Cardinal and Spin Master goods, and are likely to falsely suggest (and has already falsely suggested) a sponsorship, connection, license, or association between Plaintiff and Cardinal as well as Spin Master. This confusion, mistake, and deception will immediately and irreparably injure and tarnish the goodwill and reputation that Plaintiff has diligently labored to establish in its goods and business.

133.   Defendants' activities have caused and, if not enjoined, will continue to cause irreparable harm to Plaintiff and its rights, including, but not limited to, injuring its business reputation and the distinctive quality of Plaintiff's Marks.

134.   Defendants' unauthorized acts are designed to divert, and will have the result of diverting, customers from Plaintiff to Cardinal and Spin Master.

135.   Defendants have been unjustly enriched as a result of their unauthorized use of Plaintiff's Marks as well as marks confusingly similar to Plaintiff's Marks.

136.   Defendants' activities have caused and, if not enjoined, will continue to cause irreparable harm to the public, who has an interest in being free from confusion, mistake, and deception.

137.   The Knock-Off bears infringing marks, as is illustrated by the following image of the Knock-Off, which Cardinal sells and distributes, or contributes to the sale and distribution, throughout the State of New York:



*Fig. 46*



*Fig. 47*

138.    Cardinal licenses third-parties to manufacture, sell, and distribute the Knock-Off throughout New York under the Spin Master mark and logo and the Cardinal mark and logo.  This licensing relationship is shown on the individual tins of the infringing product in connection with the claim that the infringing games are "distributed under license by Cardinal Industries, Inc."

139.    Cardinal is selling the Knock-Off, or contributing to the same, at retail locations across New York , including, for example, in Walmart, Big Lots, Staples, Family Dollar, Dollar General stores as shown in the various figures herein.

140.    Cardinal works to encourage, facilitate, maintain, and expand sales of the infringing Knock-Off in New York or contributes to the same acts by retailers.

141.    Cardinal uses employees of its sister-subsidiary, Spin Master Inc., to service and call upon retail stores, including those in this District and Division, in order to ensure that the acts of infringement and the effort to appropriate Plaintiff's identify and Plaintiff's Marks continue.

142.    Every single unit of the Knock-Off sold constitutes a separate act of direct or contributory infringement by Walmart and Cardinal on Plaintiff's Marks, including Plaintiff's common law marks, which infringement is intentionally committed by Cardinal in New work.

143.    Plaintiff has no adequate remedy at law for the ongoing consumer confusion and injury to its goodwill from the acts of the Defendants.

## COUNT I
### Breach of Contract Against Cardinal

144.    This Count I is a claim for breach of a written trademark license agreement against Cardinal.

145.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 of this complaint as if fully set forth herein.

146.    Plaintiff's rights as set forth above in this Fourth Amended Complaint are the basis,

in part, for this Count.

147.    On May 1, 2009 Plaintiff entered into the License Agreement.

148.    Under the License Agreement, Cardinal agreed that Plaintiff owns valid, subsisting and enforceable trademarks and prohibited Cardinal from taking any action in denigration of Plaintiff's rights in the intellectual property set forth therein.

149.    The License Agreement obligated Cardinal to cooperate with Plaintiff in preserving the licensed marks and proscribed any conduct that would dilute the marks or acts that were in derogation of the property rights of Plaintiff.

150.    The License Agreement also acknowledged that Cardinal, as an exclusive licensee of the electronic dice game rights thereunder would receive proprietary information from Plaintiff, and it obligated Cardinal to preserve the confidential information so imparted to it, including financial information, business plans, sales and customer information and the promotional concepts of the licensee in connection with its exclusive license rights under the agreement.

151.    Plaintiff and Cardinal have continued under the License Agreement through the recent present. For example, Cardinal, until after this civil action was commenced, advertised the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as a Cardinal product named "LCR Hand-Held Game" on its website at http://www.cardinalgames.com/game/8, see Doc. 41-8 ¶5, as well as the screenshot of the website shown below:



*Fig. 48*

152. Cardinal thus at least pretended to be a licensed distributor of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game under the License Agreement until after it was sued in this case even though it was simultaneously selling and promoting the Knock-Off using Plaintiff's "LCR" mark as means of passing off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game so as to suggest an affiliation, connection or license relationship between the Plaintiff and Cardinal, a relationship that Cardinal had in fact repudiated.

153. Regardless of the exact status of the License Agreement at the time this litigation commenced, the License Agreement's obligations concerning Plaintiff's intellectual property rights, by express written terms of the License Agreement, survive termination. Thus, Cardinal remains in willful breach of those obligations.

154. Spin Master, acting as one common economic unit for competition with Plaintiff, was and remains the primary competitor of Plaintiff, as Cardinal is well aware.

155. Subsequent to the acquisition of Cardinal, Cardinal made many assurances to Plaintiff concerning the protection of Plaintiff's rights in an ongoing manner for the future.

156. Cardinal made these assurances to Plaintiff because, among other things, it was

aware that it had and has a duty of loyalty to Plaintiff and that it was a fiduciary to it, and thus could not simultaneously act to undermine its own principal in the marketplace vis-a-vis the principal's chief competitor without breaching its many duties to Plaintiff.

157.    In truth, notwithstanding its assurances, Cardinal did set in motion a secret plan to switch all of its then-existing retailers, vendors, customers, suppliers, and/or the like over to the competing products of Spin Master, or to contribute to such a switch, using unfair and deceptive means that were in violation of duties of an exclusive licensee under License Agreement and which were disloyal and in violation of its fiduciary duties.

158.    Notwithstanding its contract obligation to take no action in derogation or dilution of the Plaintiff's intellectual property, Cardinal breached the License Agreement by, among other things, engaging, in New York and elsewhere, in the following acts, amongst others:

(a)    duping retailers, vendors, customers, suppliers, and/or the like, to believe that Cardinal and Spin Master were supplying Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game for a cheaper price while in fact supplying them with the Knock-Off;

(b)    switching retailers, vendors, customers, suppliers, and/or the like, over to lower quality and lower price games of Spin Master, such as the Knock-Off, while passing them off as those of Plaintiff;

(c)    selling and offering to sell, to retailers, vendors, customers, suppliers, and/or the like, Cardinal and Spin Master's products while misrepresenting that the products were the original genuine article of Plaintiff or that the products were coming from the same source and were the same high quality as Plaintiff's products, including Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game;

(d)    confusing retailers, vendors, customers, suppliers and/or the like, as to the source or origin of the games Cardinal was offering under the same marks as or marks confusingly similar to Plaintiff's Marks;

(e)    engaging in conduct and making representations that were in derogation of and denigration of Plaintiff's Marks while prejudicing retailers, vendors, customers, suppliers, and/or the like, as to the source or origin of its confusingly similar goods being sold for a lesser price;

(f)    inducing vendors and retailers, vendors, customers, suppliers, and/or the like, to offer for sale products that were not authentic or original to Plaintiff under one or more of Plaintiff's Marks or marks

confusingly similar thereto;

(g)     falsely claiming that Spin Master had won legal battles which gave Spin Master the right to use or appropriate for themselves one or more of Plaintiff's Marks, or marks confusingly similar thereto, knowing well that such claims were false and in derogation and denigrations of the rights of Plaintiff;

(h)     failing to inform retailers, vendors, customers, suppliers, and/or the like, of the true facts and the multiple judgments which Plaintiff has obtained against Spin Master, making Cardinal's actual statements patently false and/or misleading;

(i)      using Plaintiff's UPC codes or other of Plaintiff's proprietary codes in conjunction with the Knock-Off and Spin Master products; and

(j)      affixing Cardinal and Spin Master's source identifiers on products in violation of Cardinal's obligations to Plaintiff and in further derogation from the rights of Plaintiff and further denigration of Plaintiff's rights; and

(k)     using confidential and proprietary information of Plaintiff to further the anticompetitive ends of Cardinal and Spin Master, in violation of Section 17 of the License Agreement and for the unjust enrichment of the Cardinal.

159.    Cardinal also breached the License Agreement by failing, in so far as Cardinal claims the License Agreement has terminated, (Doc. 32, 12), to return or destroy all unsold inventory of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as well as molds for the manufacture of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

160.    If Cardinal chose to destroy the inventory and molds, it was required to certify the same.

161.    Cardinal has never certified to Plaintiff that it destroyed its remaining inventory of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game or the molds or other implements used for production of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

162.    Cardinal has or had existing inventory of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game that it failed to return to Plaintiff in Florida as required under

the License Agreement, something shown in the continued listing of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in the inventory listing. *See* Doc. 41-1 ¶30; Doc. 41-2, p. 95 (Ex. 13)).

163. Cardinal has never returned the molds or other implements used to produce the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, which Cardinal was required to return to Plaintiff in Florida.

164. As a direct and proximate result of the aforementioned acts in breach of the agreement with Plaintiff, along with similar acts that are discovered subsequently, Plaintiff has suffered substantial monetary loss and will continue to suffer such loss in the future unless the Court takes action to enjoin the acts of Cardinal.

165. Plaintiff's losses include substantial injury to its good will and reputation and to its relationships with large retailers, vendors, customers, suppliers and/or the like, which losses will continue to be experienced and which will multiply hereafter, with prejudgment interest thereon.

166. Plaintiff has also lost substantial profits as a result of Cardinal's wrongful acts, whereby profits have been appropriated by Cardinal.

167. Monetary damages alone will not suffice to compensate Plaintiff for the injury to its brand, goodwill and customer relationships, and therefore Plaintiff has no adequate remedy at law for such ongoing injury and is being irreparably injured by the conduct of Cardinal.

### COUNT II
### Declaratory Judgment Against Cardinal

168. This Count II is a claim for declaratory judgment against Cardinal.

169. Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 of this complaint as if fully set forth herein.

170. Plaintiff's rights as set forth above in this Complaint are the basis, in part, for this

Count.

171.    An actual controversy exists over whether the License Agreement remained in effect by tacit agreement of the parties past the expiration date stated therein, and if so, through what date.

172.    Cardinal and Plaintiff's tacit agreement to continue the license relationship under the License Agreement is evidenced by Cardinal continuing to advertise the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game for sale on Cardinal's website until sometime after March 2018 and is further evidenced by the failure of Cardinal to take any actions the License Agreement required Cardinal to take at the termination of the Agreement such as returning unsold inventory as well as the molds and other implements used in the manufacture of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

173.    Another controversy between Cardinal and Plaintiff exists as to when Cardinal's license rights under the License Agreement terminated such that Cardinal no longer had any license to Plaintiff's Marks.  Plaintiff contends this occurred at the point Cardinal began acting in derogation of Plaintiff's Marks.

174.    Another controversy exists as to whether Cardinal is required to and should be mandatorily enjoined to return to Plaintiff the molds and other equipment used for the manufacture of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, including schematics, diagrams, and other materials Cardinal obtained through the License Agreement in order to manufacture the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

175.    Once the License Agreement terminated, including for breach, or expired, Cardinal was required to return items, such as molds or other articles used for the manufacture of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and unsold inventory of the

same; although Cardinal could destroy those materials that it had not rented from Plaintiff, Plaintiff had a right to witness the destruction of the same, and Cardinal never provided certification of destruction or allowed Plaintiff to witness the same. And once the License Agreement had terminated or expired, there could be a fortiori no right or license to advertise the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game as a Cardinal product, which it did through at least March 2018, as shown above, or otherwise claim or imply that had rights under license to use any of Plaintiff's Marks.

176.     Plaintiff therefore asks this Court to determine whether the License Agreement has expired, and if so, to determine when.  If the License Agreement is found to be expired, Plaintiff also asks this Court to require Cardinal to return all materials it previously acquired or possessed relating to the License Agreement, including all unsold inventory of the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and molds or other implements used for the manufacture of Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, and to cease selling, offering to sell, or advertising Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game or any other acts inconsistent with the License Agreement's termination.

**COUNT III**
**Breach of Fiduciary Duty Against Cardinal**

177.     This Count III is a claim for breach of fiduciary duty against Cardinal under the common law of the State of New York.

178.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 of this complaint as if fully set forth herein.

179.     Plaintiff's rights as set forth above in this Complaint are the basis, in part, for this Count.

180.     Because Cardinal was the exclusive licensee of Plaintiff's Marks in the important

electronic game market segment throughout the United States, Plaintiff developed a confidential relationship whereby confidential business information relating to Plaintiff's games and Plaintiff's marketing strategies, proprietary business plans, concepts, and positioning in the market place vis-a-vis retailers, vendors, customers, suppliers, competitors, and/or the like, including Spin Master, was imparted by Plaintiff to Cardinal throughout the relationship of the parties.

181.    As an exclusive licensee in the electronic game market, Cardinal had a duty to be loyal to Plaintiff and was as a matter of law a fiduciary to Plaintiff.

182.    Separate from the License Agreement, Cardinal also had a distribution agreement with Plaintiff to distribute Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game under which distribution agreement Cardinal also had fiduciary duties to Plaintiff.

183.    In addition, Plaintiff reposed trust and confidence in Cardinal and its President, Joel Berger, and that trust and confidence was knowingly accepted and encouraged by Cardinal.

184.    Cardinal and Joel Berger were regularly provided with, and encouraged Plaintiff to provide, confidential and proprietary information relating to Plaintiff's specific marketing concepts and plans, and they were regularly consulted by Plaintiff on confidential matters relating to Plaintiff's business.

185.    Recognizing that confidential information would be exchanged, the License Agreement expressly protected Plaintiff's confidential information.

186.    Under these circumstances and under New York law there accordingly existed a fiduciary relationship between Plaintiff and Cardinal.

187.    The relationship remained in place during the time that Cardinal was negotiating with and being acquired by Spin Master and even thereafter until the full measure of Cardinal's false statements and misrepresentations became known to Plaintiff.

188.    Cardinal thus remained a fiduciary for and sales representative to national retailers like Walmart even after it was acquired by Spin Master.

189.    Cardinal continued for a time to represent the interests, or purport to represent the interests of Plaintiff, including at Walmart, where Cardinal enjoyed log-in privileges for the Walmart Retail Link database and the ability to make changes therein concerning Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

190.    At the very time that Cardinal remained a sales agent and fiduciary to Walmart for Plaintiff, Cardinal made secret arrangements to switch Walmart over to the Knock-Off, agreeing with a Buyer for Games at Walmart that Cardinal would offer the Knock-Off for a lower price.

191.    After making this agreement with Walmart, however, Cardinal kept this fact secret from Plaintiff, and Cardinal began to actively plan to stop buying inventory of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game from Plaintiff while planning on deceptively introducing the Knock-Off to Walmart consumers as LCR, i.e. Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

192.    Cardinal engaged in this deceptive scheme knowing that it was a fiduciary to Plaintiff and intending to appropriate Plaintiff's goodwill for its Spin Master parent and affiliates.

193.    During or about late 2015 and continuing up to the filing of this action, Cardinal in the State of New York and elsewhere breached its fiduciary duties to by, among other things:

(1)    imparting confidential and proprietary information to the Spin Master, including specific future designs relating to product strategies and packaging art work for a major product release, knowing that such conduct was disloyal to Plaintiff, their principal;

(2)    plotting with Spin Master to engage in a false and/or deceptive marketing scheme for the appropriation of all of Plaintiff's business with the many of the largest retailers in the world, using such false and/or deceptive marketing schemes, consumer confusion, unfair competition and trademark infringement, all for the purpose of

leveraging Cardinal's position with Plaintiff so as to take over nearly simultaneously all of Plaintiff's retail business through unfair and/or deceptive means;

(3)     using Cardinal's superior knowledge of Plaintiff's secret marketing and pricing strategies to promote the Knock-Off to large retailers, vendors, customers, suppliers, and/or the like, retailers at lower low-ball prices while leading the retailers, vendors, customers, suppliers, and/or the like, retailers to believe that the games they were getting from Cardinal and Spin Master under confusingly similar marks, product codes, packages, were either the same games or were coming from the same source;

(4)     making false and/or misleading representations about the alleged Spin Master rights to use Plaintiff's trademarks on Cardinal and Spin Master products, and false and/or misleading claims that a federal court had approved Cardinal and Spin Master's use of Plaintiff's Marks, well knowing that such conduct had been previously enjoined;

(5)     leveraging Cardinal's relationships with retailers, vendors, customers, suppliers, and/or the like, which relationship Cardinal enjoyed only because it was the exclusive licensee of Plaintiff to persuade buyers to buy Cardinal and Spin Master's lower grade games based on the false claim that the products were the same as those of Plaintiff and that they could be legally sold under substantially similar trademarks to those of Plaintiff, made through the same representatives at Cardinal that said retailers, vendors, customers, suppliers, and/or the like had done business with while Cardinal represented Plaintiff;

(6)     engaging in other misuse of confidential, proprietary and insider information of Plaintiff to improperly compete with Plaintiff through the sale and marketing of Cardinal and Spin Master products through marks which were the same or substantially similar as Plaintiff's Marks.

194.    Cardinal has acted with the specific intent to profit from the abuse of its fiduciary duties and did so knowingly, unlawfully, and/or with malice.

195.    Plaintiff has suffered substantial financial harm as the direct and proximate result of the breach by Cardinal, which harm includes loss of most of Plaintiff's retail accounts due to the improper acts of its former exclusive licensee.  Cardinal acted with the specific intent to profit from

the abuse of its fiduciary duties and did so knowingly, unlawfully and with malice.

196.    Plaintiff has suffered substantial financial harm as the direct and proximate result of the breach by Cardinal, which harm includes loss of most of Plaintiff's retail accounts due to the improper acts of its former exclusive licensee.

## COUNT IV
### Federal Trademark Infringement 15 U.S.C. § 1114 Against All Defendants

197.    This Count IV is a claim for federal trademark infringement against all defendants.

198.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 of this complaint as if fully set forth herein.

199.    Plaintiff's rights as set forth above in this Fourth Amended Complaint are the basis, in part, for this Count.

200.    Walmart is a customer of Cardinal and was a customer of Cardinal at the time Cardinal began representing Plaintiff at Walmart.

201.    Cardinal's President, Mr. Berger, has testified in substance that in late 2017 Walmart, through its buyer, Ms. Treat, agreed to buy the Spin Master Knockoff at a lower price than it was paying to Cardinal for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

202.    Cardinal stated to Treat, according to Berger, that Cardinal would continue to sell units of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to Walmart until Cardinal's inventory of Plaintiff's game ran out, at which point it would sell the Knock-Off to Walmart.

203.    Walmart agreed with Cardinal that it would allow the sell-off of the then-existing inventory of Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and then would begin buying the Spin Master-made but Cardinal-licensed Knock-Off from Cardinal.

204.    Walmart therefore had actual knowledge that it would no longer be selling or carrying Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game once Cardinal's inventory of the

same was exhausted and the sale of the Knock-Off at Walmart commenced.

205.    Walmart nevertheless continued to keep the Item Numbers assigned to Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in its Retail Link database and allowed Cardinal to link the Knock-Off in Retail Link with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

206.    Walmart thereafter made the decision to buy the Knock-Off from Cardinal and to cause the Knock-Off to be distributed to stores throughout New York.

207.    Walmart thereafter sold the infringing Knock-Off to retail consumers in this District and Division.

208.    Walmart used shelf-talkers and other forms of retail displays to pass off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

209.    Walmart also distributed the Knock-Off or caused the Knock-Off to be distributed to consumers in this District and Division even when consumers, including New York consumers, ordered Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game on-line from Walmart, as the seller, through Walmart.com, an interactive website.

210.    Without Plaintiff's consent, Cardinal and Walmart are advertising and planning to use and have distributed in commerce a reproduction, copy, and colorable imitation of Plaintiff's Marks in connection with the sale, offering for sale, distribution, and advertising of goods, including the Knock-Off, which use has caused confusion, is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

211.    Defendants have aided and abetted each other in their acts of infringement and have caused and contributed to the infringement of the other, acting pursuant to a common scheme and plan.

212.    Cardinal has acted intentionally and in bad faith.

213.    Walmart has acted intentionally and in bad faith.

214.    As a result of Cardinal's acts, Plaintiff has suffered damages, with interest.

215.    As a result of Walmart's acts, Plaintiff has suffered damages, with interest.

216.    Each Defendant has also reaped an ill-gotten profit from the unlawful conduct.

## COUNT V
### Federal Trademark Infringement: All Defendants

217.    This Count V is a claim for federal trademark infringement against all defendants.

218.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 and paragraphs 158 through 167 of this complaint as if fully set forth herein.

219.    Plaintiff's rights as set forth above in this Fourth Amended Complaint are the basis, in part, for this Count.

220.    Without Plaintiff's consent Defendants Cardinal, Walmart, Spin Master Corporation, Spin Master US Holdings, Inc., Spin Master Acquisition, Inc., Joel Berger and Spin Master LTD , each aided and abetted by each other in a common scheme and plan, have advertised and are continuing to advertise and are using and plan to continue using in commerce, in this Division and District and throughout much of the nation, a reproduction, copy, and colorable imitation of Plaintiff's Registered Marks in connection with the sale, offering for sale, distribution, and advertising of goods, which use is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C.§1114(1).

221.    Defendants have acted intentionally and in bad faith and with malice.

222.    As a result of the acts of infringement, which are ongoing, Plaintiff has suffered and will in the future suffer damages, with interest, and ongoing and irreparable injury.

223.    The damages suffered include the damages necessary for corrective advertising to remedy the cumulative effect of the campaign of infringement in which Cardinal and Walmart

have engaged, which Plaintiff is unable to correct through its own resources as a small family company.

<b><u>COUNT VI</u></b><br>
<b>Contributory Trademark Infringement: Cardinal, Berger,<br>
and The Spin Master Defendants</b>

224.    This Count VI is a claim for federal trademark infringement against Cardinal, Berger, Spin Master Corporation, Spin Master US Holdings, Inc., Spin Master Acquisition, Inc., and Joel Berger for contributory federal trademark infringement.

225.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 of this Complaint as if fully set forth herein.

226.    Beginning in at last 2017 and continuing to the present, in this District and elsewhere, Cardinal and Berger and the Spin Defendants embarked on a scheme to cause retail customers in this District and Division and elsewhere in the United States to sell, promote, and distribute the infringing Knock-Off on retail store shelves and under headers or shelf talkers using marks and designations confusingly similar to Plaintiff's Marks, intending to cause confusion and to deceive.

227.    Accordingly, without Plaintiff's consent, retailers, vendors, distributors, suppliers, and the like, including Walmart, one of the nation's largest retailers, who are licensed by or in contract with Cardinal are selling and advertising and plan to continue use in commerce in this District and Division a reproduction, copy, and colorable imitation of Plaintiff's Registered Marks in connection with the sale, offering for sale, distribution, and advertising of goods, which use is likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

228.    The retailers and vendors include, in addition to Walmart, at least Walmart, Target,

Big Lots, Family Dollar, Staples, and Kohl's and Wegmans each of whom has directly infringed Plaintiff's Marks in so far as they have sold and continue to sell, in this District and Division, the Knock-Off falsely identified as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game through various means, including, for example, using shelf talkers, receipts, packaging, or product scanners, to pass off the infringing Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

229. Cardinal and Berger, its president, have caused and contributed to the infringement of the retailers and their distributors, knowing that it was causing the infringement and intending to do so and aiding and abetting that infringement.

230. Cardinal and its president Berger has also caused to be imported into the United States and thence distributed to this District and Division shipping boxes containing its Knock-Off, which shipping boxes bear Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game UPC and Plaintiff's Marks, including "LCR", intending thereby to continue to pass off the infringing Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to the retailers and to cause and induce the retailers to continue to identify the Knock-Offs in their respective computer systems as "LCR" or other marks confusingly similar thereto. Cardinal has even caused affiliates of Cardinal., namely, employees of Spin Master Inc, to service and monitor the retail distribution of the infringing Knock-Offs.

231. Cardinal and Berger have acted intentionally, knowingly, and in bad faith.

232. Berger stood to gain financially from his own leadership and participation in the deceptive scheme and acted in part to benefit himself, knowing he was acting unlawfully.

233. As a result of the aforesaid acts, Plaintiff has suffered damages, with interest and Defendant has reaped ill-gotten profit from its unlawful conduct.

234. The damages suffered include the damages necessary for corrective advertising to

remedy the cumulative effect of the campaign of infringement in which Cardinal and Walmart have engaged, which Plaintiff is unable to correct through its own resources as a small family company.

### COUNT VII
**Federal False Designation Of Origin, Passing Off, And Unfair Competition
Under Section 43(A)(1)(A) Of The Lanham Act, 15 U.S.C. §1125(A)(1)(A)
Against All Defendants**

235.     This Count VII is a claim against all defendants for violation of Section 43(a) of the Lanham Act.

236.     Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130.

237.     Plaintiff's rights as set forth above in this Complaint are the basis, in part, for this Count.

238.     Defendants Cardinal and Berger and the Spin Defendants and Walmart and Wegmans each aided and abetted by each other, have advertised and are advertising and have used and plan to continue to use in commerce a word, term, name, and false designation of origin that, in connection with their commercial activities, is likely to cause confusion, or to cause mistake, or to deceive as to an affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' goods by Plaintiff, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C.§1125(a)(1)(A).

239.     Defendants have acted intentionally and in bad faith and with malice.

240.     As a result of the Defendants' acts of infringement, Plaintiff has suffered damages, with interest.

241.     The damages suffered include the damages necessary for corrective advertising to remedy the cumulative effect of the campaign of infringement in which Cardinal and Walmart have engaged, which Plaintiff is unable to correct through its own resources as a small family company.

## COUNT VIII
### Contributory False Designation of Origin, Passing off and Unfair Competition: Cardinal, Berger and The Spin Defendants

242.    This Count VIII is a claim against Cardinal, Berger, and The Spin Defendants for contributory false designation of origin, passing off and unfair competition under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C.§1125(a)(1)(A).

243.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

244.    Cardinal and Berger and the Spin Defendants, each aided and abetted by the other as part of a common scheme and plan, are intentionally and knowingly contributing to and have intentional contributed to the direct acts of retailers, suppliers, and vendors, or the like to falsely designate the origin of the Knock-Off,  and to passing off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game or as being made by, affiliated with, approved by, or otherwise connected with Plaintiff, and to acts of unfair competition with Plaintiff, all to the intentional deception of consumers and to cause a likelihood of confusion.

245.    The acts of contributory false designation of origin, passing off, and unfair competition, include causing and induce retailers, suppliers, vendors, or the like, such as Walmart, advertising and using in commerce a word, term, name, UPC code and false designation of origin that, in connection with commercial activities, is likely to cause confusion, or to cause mistake, or to deceive as to an affiliation, connection, or association of Cardinal/Spin Master with Plaintiff, or as to the origin of Cardinal and Spin Master's goods, or sponsorship or approval of Cardinal and Spin Master's goods by Plaintiff, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

246.    The aforesaid Defendants have contributed to these acts and continue to contribute

to these acts by, for example and not by limitation, their knowing introduction of the Knock-Off to retailers as "LCR", and importing and causing to be imported the Knock-Off as "LCR" into the United States for later sale and distribution to retailers; shipping the Knock-Off to retailers in Cardinal shipping boxes falsely identifying the Knock-Off as "LCR", such as in the case of Walmart, where said shipping boxes of six Knock-Off units are offered for purchase directly from Walmart stores in said shipping boxes; falsely identifying the Knock-Off as "LCR" in the Walmart Retail Link entries for the Knock-Off and causing or inducing the ultimate Retail Link entries identifying the Knock-Off with "LCR" and linking the Knock-Off to Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game Retail Link entries, all for the purpose of causing confusion as to the source or origin of the Knock-Off and to pass the same off as the Genuine LCR/LEFT CENTER RIGHT Game or as implying and suggesting that the Knock-Off is affiliated with, approved by, or otherwise connected with Plaintiff, and to acts of unfair competition with plaintiff.

247. By their conduct Cardinal, Berger, and the Spin Defendants have caused, induced and intentionally contributed to the acts of direct false designation of origin and passing off and unfair competition of the retailers, including the direct acts of Walmart, Defendants, aided and abetted by each other have acted to misappropriate for the commercial advantage of Defendants the property of Plaintiff, a New York corporation, namely Plaintiff's Marks, by advertising and intending to use and using the Infringing Marks, and the Knock-Off, all occurring after Plaintiff's Marks acquired distinctiveness, and by misrepresenting the source, sponsorship, approval, affiliation, connection, and/or association of Cardinal and Spin Master's goods and commercial activities with those of Plaintiff and by passing off and engaging in reverse passing off or causing passing off and reverse passing off for the purpose of causing and causing deception, fraud, unfair competition, and/or misrepresentation and to suggest a connection, affiliation, or sponsorship of the

Knock-Off by or in connection with Plaintiff.

248.    As a result of Cardinal and Walmart's acts, Plaintiff has suffered damages, with interest, and each Defendant has reaped ill-gotten profit from its unlawful conduct.

249.    By their actions Defendants have caused actual confusion and a likelihood of confusion and such confusion will continue unless Defendants are enjoined by this Court.

250.    In so acting Defendants have acted as part of a common scheme and plan of unfair competition and deception, well intending to injure Plaintiff.

251.    Plaintiff is suffering irreparable injury and will continue to suffer such injury unless the Defendants are enjoined by this Court.

252.    Defendants have acted intentionally, knowingly, and in bad faith and with malice.

253.     As a result of the aforesaid acts, Plaintiff has also suffered damages, with interest, and Defendants have each reaped ill-gotten profit from their unlawful conduct.

254.    The damages suffered include the damages necessary for corrective advertising to remedy the cumulative effect of the campaign of infringement in which Cardinal and Walmart have engaged, which Plaintiff is unable to correct through its own resources as a small family company.

## COUNT IX
### Unfair Competition Under New York Law Against All Defendants

255.    This Count IX is a claim for unfair competition against all Defendants under the common law of New York.

256.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

257.    Plaintiff's Marks are inherently distinctive and have acquired distinctiveness.

258.    Defendants, aided and abetted by each other have acted to misappropriate for the commercial advantage of Defendants the property of Plaintiff, a New York corporation, namely

Plaintiff's Marks,  by  advertising and intending to use and using the Infringing Marks, and the Knock-Off, all occurring after Plaintiff's Marks acquired distinctiveness, and by misrepresenting the source, sponsorship, approval, affiliation, connection, and/or association of Cardinal and Spin Master's goods and commercial activities with those of  Plaintiff and by passing off and engaging in reverse passing off or causing passing off and reverse passing off for the purpose of causing and causing deception, fraud, unfair competition, and/or misrepresentation and to suggest a connection, affiliation, or sponsorship of the Knock-Off by or in connection with Plaintiff.

259.    As a result of Cardinal and Walmart's acts, Plaintiff has suffered damages, with interest, and each Defendant has reaped ill-gotten profit from its unlawful conduct.

### COUNT X
### Contributory Unfair Competition Under the Common Law of New York

260.    This Count X is a claim for contributory unfair competition against Cardinal, Berger and the Spin Defendants under the common law of New York.

261.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

262.    Plaintiff's Marks are inherently distinctive and have acquired distinctiveness.

263.    Defendants Cardinal, Berger and the Spin Defendants, aided and abetted by each other, have acted to misappropriate for the commercial advantage of Defendants the property of Plaintiff, a New York corporation, namely Plaintiff's Marks, by advertising and intending to use and using the Infringing Marks, and the Knock-Off, all occurring after Plaintiff's Marks acquired distinctiveness, and by misrepresenting the source, sponsorship, approval, affiliation, connection, and/or association of Cardinal and Spin Master's goods and commercial activities with those of Plaintiff and by passing off and engaging in reverse passing off or causing passing off and reverse passing off for the purpose of causing and causing deception, fraud, unfair competition, and/or

misrepresentation and to suggest a connection, affiliation, or sponsorship of the Knock-Off by or in connection with Plaintiff.

264.    The acts of unfair competition by retailers such as Walmart, Walmart.com, and Kohls have been caused and induced by the Defendants named in this count, each of whom have aided and abetted the other to cause the direct acts of the aforesaid retailers, intending to profit from the resulting actual confusion and the likelihood of future confusion.

265.    As a result of acts of unfair competition and actual confusion resulting therefrom, Plaintiff has suffered damages, with interest, and each Defendant has reaped ill-gotten profit from its unlawful conduct.

266.    The Defendants named in this Count acted knowingly and intentionally and with malice and in bad faith.

267.    The damages suffered include the damages necessary for corrective advertising to remedy the cumulative effect of the campaign of infringement in which Cardinal and Walmart have engaged, which Plaintiff is unable to correct through its own resources as a small family company.

**COUNT XI**
**Conspiracy to Infringe Plaintiff's Marks and Unfairly Compete with Plaintiff**

268.    This Count XII is a claim against Cardinal and Walmart for civil conspiracy to infringe Plaintiff's Marks and to unfairly compete with Plaintiff in violation of the Lanham Act and New York common law.

269.    Plaintiff incorporates and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

270.    Beginning in at least 2017 and continuing to the present, in this District and Division and elsewhere, Cardinal aided and abetted by Berger and the Spin Defendants and Walmart conspired, confederated and agreed to commit trademark infringement and unfair

competition in violation of 15 U.S.C. §§ 1114, 1125(a)(1)(A),  and the common law of New York by distributing and promoting and selling the Knock-Off games in this District and Division and elsewhere, well intending to cause the retail shelves of retailers to display the infringing Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and to confuse consumers as to the source or origin of the goods being offered and to create a likelihood of consumer confusion.

271.    It was part of the aforesaid conspiracy and in order to attain the unlawful aims of the conspiracy that Cardinal, aided and abetted by the Spin Defendants would and did promote the Knock-Off as a lower-price substitute for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game under the same "LCR" mark  and would cause confusion at the retail level about the source or origin of the Knock-Off and, in so doing, to convince the retailers to promote the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, even using Plaintiff's UPC code for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and other identifiers in the retail store databases that associated Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game with the Knock-Off and on shelf displays and other in-store identifiers and on cash register receipts.

272.    It was also part of the aforesaid conspiracy that Cardinal and the Spin Defendants would cause the retailers to believe that the Knock-Off could be advertised and promoted as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, even using Plaintiff's UPC code for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and other identifiers of Plaintiff in connection with the retail store sales of the Knock-Off.

273.    It was also part of the aforesaid conspiracy that Cardinal and the Spin Defendants would and did cause the retailers to fulfill orders for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game with the Knock-Off, as if the Knock-Off was Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, and thereby passing off the Knock-Off to retail consumers as Plaintiff's

Genuine LCR/LEFT CENTER RIGHT Game.

274.     It was also part of the aforesaid conspiracy that Cardinal and the Spin Defendants would and did cause employees of its affiliate, Spin Master Inc., to call upon its retailers to service the infringing sales and to aide, abet and facilitate the acts of infringement by the retailers, such as Walmart.

275.     It was also part of the aforesaid conspiracy that Cardinal and the Spin Defendants would and did engage in a national advertising campaign on their websites, which were partially interactive and viewable by consumers, to promote that it was in fact a source of LCR goods, namely the Electronic Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game under which it had been licensed.

276.     By using such advertising that linked Cardinal to LCR at the same time it was promoting the Knock-Off to retailers as LCR, as well as through using its distribution relationship with Plaintiff to distribute Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to big-box retailers such as Walmart, Cardinal in conjunction with the Spin Defendants was able to initially confuse retailers and then to elicit them knowingly into passing off the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, thereby obtaining the cooperation of the retailers in confusing consumers as to the source or origin of the Knock-Off.

277.     In order to accomplish the objects of the aforesaid conspiracy, Cardinal caused the following over acts to be committed:

1) Cardinal falsely advertised, as described above, that it was the source for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and caused retailers to promote the Knock-Off as if it were Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, well intending to cause confusion as to the source or origin of its games, as more particularly set forth

above.

2) Cardinal supplied the infringing Knock-Off to retailers for distribution in New York and elsewhere, including Walmart.

3) Cardinal entered into an agreement with Walmart to switch the Knock-Off for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and rigged the Walmart Retail Link database to ensure the Knock-Off would scan as "LCR" and be displayed in Walmart stores, including those in New York, where the injury to Plaintiff would be suffered, as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

4) Cardinal, with Walmart's tacit or express permission, linked the Knock-Off's UPC and Retail Link entries with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game in Retail Link in order to cause the Knock-Off to be associated with and even to ring up as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game at Walmart retail stores as well as to be used in fulfilling orders for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game placed with Walmart, as the seller, through Walmart.com.

5) Cardinal used its knowledge of and access to the UPC for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and associated product information to cause Walmart and other retailers to switch-out Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game with the Knock-Off while advertising the Knock-Off at retail stores as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

6) Cardinal caused employees of an affiliate, namely employees of Spin Master, Inc., to service retail stores in order to ensure that the false and deceptive promotion of the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game continued unabated and without correction by the retailer.

7) Cardinal caused shelf-talkers at the retailer stores of Walmart in New York and elsewhere to promote the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

8) Cardinal caused Walmart personnel to attach or permit the attachment of labels bearing the Knock-Off's UPC on Knock-Off units that were imprinted with the UPC for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, obscuring that the Knock-Off units were imprinted with the UPC for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

9) Cardinal caused Walmart to fulfill internet placed orders for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, placed on Walmart.com with Walmart as the seller, with the Knock-Off.

10) Cardinal caused Walmart to continue to use LCR in connection with the promotion or display off information on the Walmart retail shelves in New York and elsewhere even after it was sued in this action, well intending to keep up the infringement notwithstanding this litigation and even the subpoena of Walmart records relating to the infringement.

11) Cardinal promised to indemnify retailers, including Walmart from trademark infringement liability in this action, in order to induce retailers to continue to engage in trademark infringement and to continue to reap the rewards of its illegality;

278.    Walmart, in furtherance of the aforesaid conspiracy, committed the following overt acts in New York and elsewhere:

1) Walmart allowed Cardinal to make entries in Retail Link that would cause the shelf-talkers, receipts, and product scanners used to identify or promote the Knock-Off to falsely identify or promote the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, which Knock-Off it agreed to buy from Cardinal for a cheaper price than Walmart had been paying for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

2) Walmart sold the Knock-Off nationwide to the public, using shelf displays and other messages to promote the Knock-Off as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

3) Walmart permitted its Retail Link database to be manipulated such that the Knock-Off Games would be displayed and even scanned in Walmart stores as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game.

4) Walmart supplied or permitted its Walmart.com fulfillment personnel to supply the Knock-Off games to customers who had ordered Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game from Walmart.com, from Walmart as the seller, as Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game while Walmart knew that the Knock-Off was not Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game and that consumers would be confused.

5) Walmart allowed Cardinal, affiliates of Cardinal, or its own Walmart employees, to alter the product listing on Walmart.com for Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game, falsely changing the description and images associated with Plaintiff's Genuine LCR/LEFT CENTER RIGHT Game to those of the Knock-Off, and did so even after knowing such changes were false and unauthorized;

6) Walmart continued the acts of infringement even after it knew Plaintiff had filed this civil action, agreeing with Cardinal and Cardinal's affiliated companies, that Walmart would be indemnified from any damages that might be assessed against it.

279. Defendants acted intentionally and knowingly and in bad faith.

280. As a result of Defendants' acts, Plaintiff has suffered damages, with interest and Defendants have each reaped ill-gotten profit from their unlawful acts.

## COUNT XII

Fraud in the inducement of Plaintiff by, SPIN MASTER CORP; SPIN MASTER US HOLDINGS, INC.; SPIN MASTER LTD; SPIN MASTER, INC.; CARDINAL INDUSTRIES, INC.; and JOEL BERGER

281.    This Count XI is a claim against defendants for fraud in the inducement.

282.    Plaintiff realleges paragraphs 1-130 as if fully set forth herein.

283.    Defendants' have committed fraud because:

    i.      Made representations about production and shipments

    ii.     Regarding material facts

    iii.    Which were false due to the counterfeiting of the product

    iv.     In order to have George and Company rely upon it

    v.      And, George and Company did so rely

    vi.     It did not know of the false statements at the time

    vii.    Which lead to the counterfeit of his product losing significant amount of sales and profit.

284.    Sometime in 2004, Cardinal inquires, about licensing George and Co. game in the attempt to lure George and Company into an agreement to which George and Co. later, learned to use its game in order to profit with another company (see letter).

285.    Sometime thereafter, Cardinal produces UMD Dice Game, a copy of the George and Co. game.

286.    Around 2008, Cardinal inquires George and Company about licensing Electronic Version of LCR/Left Center Right Game only.

287.    George and Company then executes a licensing agreement with Cardinal for an Electronic Game in a written contract.

288.    Cardinal presents Electronic Game to Walmart, etc.   And Joel Berger, a representative of Cardinal says in a phone conversation "Walmart wants our Original LCR / Left Center Right Dice Game too."

289.    George and Company agrees to let Cardinal represent them with Walmart for the original LCR / Left Center Right dice game, in a phone conversation.

290.    The specific terms of this agreement were detailed in emails between the parties.

291.    In 2010, Cardinal produces the Electronic Game at their factories and supplies vendors from their warehouses.

292.    George and Co produces the Original Dice Game (Blue Tin)  at a factory in China and  initially ships direct in container to Cardinal warehouse in NY to supply their accounts  i.e. Walmart, Kohls.

293.    George and Co has an Agreement with Cardinal to purchase (Blue Tin) by container loads for a set price per unit.  These are purchased in Master Cartons of 12 pieces.

294.    Walmart starts ordering and the first PO number15653 (PO = purchase order) and it is placed by Cardinal on 4/30/2010.

295.    The shipment arrives to Cardinal at or around 7/14/2010.

296.    An actual hard copy of PO 15653 is received by George and Company.

297.    Everything seems to be going per the contract except for some slow paying of invoices by Cardinal.

298.    George and Co is no longer receiving hard copies of PO's are received.   Usually, just an email with a PO numbers and instructions in a less formal manner from Cardinal.

299.    George and company sends communication via EMAIL TO JOEL Berger.  George and Co states that he heard rumors of you possibly selling your business in an email dated 3/9/2015.

300.     Shortly thereafter in the same, Peter Smilanich of George and Co. received a phone call by Joel Berger and he tells him that there are two interested parties.  One being Spin Master and "He will keep me posted."

301.     On 3/26/2015,  Donna Frankel of Cardinal has a new packaging  request for Blue Tins.  It is now increased to 48 pc. Masters 8 inner of 6 pcs.

302.     On 4/8/2015,  George and Co. creates new bar codes for 48 Master ctn and 6 pc. Inners  per email by George and Co. on same date.

303.     On 10/30/2015,  Peter Smilanich of George and Co reaches out to Joel Berger.   He asks "Are you available to talk?"

304.     On 10/30/2015, Peter has a phone conversation with Joel.  Joel Berger says, "he ended up selling to Spin Master", but that he promised that he would be staying on and that there will be "no change" with our arrangement for 5 years, maybe longer.

305.     On 1/30/2016, George and Company ships new orders shipping to California by Goldstein's request.

306.     On 2/4/2016 a new PO 4500195712 came for a potential 40' container provided in an email from Goldstein.

307.     On 2/5/2016 in a message from Goldstein, he asks to reduce the order because "Spin wants to keep inventory a bit tighter than Joel."

308.     This alerted George and Co. because not really the true volume dealt with in the past, and was a slight misrepresentation for several reasons, including Joel's promise to keep control of the product rather than Spin Master.

309.     On 5/27/2016 Goldstein asks about putting their Uniform Product Code (UPC) on George Co. Blue Tin and George and Co tells him that that is only to be put on our products because

this would be a misrepresentation.

310.    On, 9/25/2016, Goldstein inquires on a date for delivery to ship to Carson, California for a 20' container of #119 and Peter Smilanich of George and Company tells him, he can ship by Nov 11, 2016.

311.    On 9/28/2016, Spin Master asks for George and Co. to supply them with LCR dice to complete some Spin Master orders in Mexico.

312.    At this point, Cardinal and Joel, were planning to counterfeit the LCR product by producing it themselves which George and Co. learned of this in 2017, December, when they saw the game being marketing.

313.    This means Spin Master wanted to take over the entire game from George and Co. in contravention to the agreement.

314.    George and Company denies their request to supply the LCR dice to Mexico because LCR is the registered trademark of George and Company.

315.    Again, it seems Joel's promise to keep control is no longer because decision wear appearing to be made but were not made by Joel Berger.

316.    On 9/29/2016, after George and Co, does not allow them to take over the product, Goldstein holds on placing order for Item #119 to California.

317.    George and company tells them of a busy schedule with China and needs more time to manufacture product and ship.  Goldstein seems to understand, and says he will place order to ship 2/21/2017, once Chinese New Year holiday (CNY) is over.

318.    During the CNY, the factory shuts down all production and work for several weeks.

319.    On 10/5/2016, Peter Smilanich of George and Co suggests to ship before CNY.

320.    On 10/12/2016,  Peter contacts Goldstein.  Again, Peter tells him about scheduling

and shipment times. Goldstein says, "gonna wait on this for now."  Goldstein further says, he heard of updating the artwork.

321.   Peter Smilanich asks, " Updating the artwork on the outer carton?" then  Goldstein says: "No updating the TIN."   This is a change to the actual product.

322.   On 10/13/2016 Peter  Smilanich contacts Joel, about cancellation of order for 2/21/2016 and artwork change question.  Joel claims he knows nothing, but will check.   Joel says only licensed items change art, not this. (suspicion of losing control by Joel).

323.   On 10/28/2016, George and Co send a reminder to Goldstein and Joel Berger that the   factory in China needs 6-8 weeks production time and 2-3 weeks delivery time.   Now Goldstein says; "Looking at demand, good through July 2017 with current on hand situation."

324.   On 11/29/2016, Goldstein says Cardinal needs to order 20' container for California to arrive around 4/1/2017.

325.   On 12/2/2016, George and Co. tells them it can be ready by March 7, 2017.

326.   On 12/8/2016, George and Co. tells Goldstein we need a PO number and instructions for packing and that we need to work around CNY.

327.   Goldstein says; "Going to wait a bit longer to place order" …   "Thinks maybe for April 15, 2017"

328.   Peter of George and Co suggest, if he knew the packaging, we can have ready to ship.

329.   Goldstein agrees, and says he will cut a PO.  He does with PO #4500229303.

330.   George and Co learned later this is the last order for US deliveries.  No delivery address was given because Goldstein states the warehouse might be moving.

331.   On 3/20/2017, George and Company sends Goldstein a message asking for delivery

address.  Goldstein states he needs to delay shipment due to moving to new facility.  He now says, delay to leave China until 4/24/2017.

332.    On 5/12/2017, George and Co notifies Goldstein of May 14 arrival of shipment from China.

333.    On 5/25/2017, George and Company enquires about Kohls.

334.    At this point, George and Company learns that a different sticker was put on their product without the consent of George and Co.

335.    George and Co learns this because he says it did not make this sticker change, it was either Spin Master and Cardinal.

336.    Asks about providing LCR with different sticker. George and Co says no, it does not sticker for Kohl's because they did in-house per Goldstein.

337.    On 6/28/2017, George and Co. checking in on inventory with Goldstein, says he's good up to December.  He says he will place new order around Aug 1, 2017.

338.     Peter Smilanich of George and Co. asks if he can forecast a 20' or 40' order for November., so that he can plan ahead.

339.    He also asked what Goldstein is doing for the Kohl's account?  Goldstein replies; "A 40' for Nov. 2017,"  and admits they did re-packing for Kohl's in house.

340.    On 8/11/2017, George and Company asks Goldstein about this Nov. shipment again.

341.    He asks how it would be packed because he wants to be prepared.  But, told to hold, Goldstein needs to look at inventory situation because they are watching inventory levels.

342.    On 9/05/2017, in an email from Goldstein, he is checking on inventory levels. George and co states that we need to give the factory enough time for printing and production.

Goldstein replies; " Need a couple of days."

343.   On 9/16/2017, George and Company again contacts Goldstein to check on inventory without reply.

344.   On 9/20/2017, George and Co again contacts Goldstein to checking on inventory. George and Co says time is getting short for a Nov. 15th shipment.  George and Company copies Joel Berger.

345.   Mike Goldstein responds, Kohl's was re-packed in-house and Walmart now good through January 2018 based on forecast.  Goldstein says we haven't run purchasing requisition for Feb yet.

346.   On 11/8/2017, George and Co contacts Goldstein to check on inventory because George and Company needs to schedule around CNY;  No reply received by Goldstein.

347.   11/21/2017, George and Co contacts Goldstein.  George and Company, says "It's been 2 months.  Have you run your purchasing requisition for Feb. yet? "No Reply again.

348.   11/22/2017, George and Co. contacts Joel.  George and Company tells Joel Berger that we have been trying to get a response from Goldstein on inventory for Walmart in US.    Joel says he will follow up.

349.   11/28/2017 George and Co. finally response from Goldstein.   He asks for a phone number so Joel can reach me.  On 11/29/2017, I give him one and a good time to reach me. No call from Joel.

350.   11/30/2017,  George and Company again Contacts Goldstein.  Tell him I did not hear from Joel. Maybe we can connect tomorrow around 11:00 am.  No Reply.

351.   12/7/2017, George and Company Contact Goldstein.  Any updates on Walmart inventory?

352.    No reply.

353.    This entire plan was to steal the LCR and to mislead George and Company and this made it impossible to have another distributer rather than Joel for Walmart.

354.    Joel did that so that Spin Master could make the knock off and supply Walmart.

355.    Never did get a response on any questions and never heard from Joel about the issues above.

356.    12/8/2017, Goldstein emails asking about purchase order for Canada rather than the US, if it is going to be on delivered on time, but this was later cancelled.

357.    In December 2017, George and Co. learned of the counterfeit game by observing them at Walmart.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, George & Company LLC, requests that this Court enter judgment against SPIN MASTER CORP; SPIN MASTER US HOLDINGS, INC.; SPIN MASTER LTD; SPIN MASTER, INC.; CARDINAL INDUSTRIES, INC.; WALMART INC., a foreign profit corporation; and JOEL BERGER for relief set forth above and award it relief including, but not limited to, the following:

(A)     an Order declaring that Walmart and Cardinal's actions and their use of marks identical to Plaintiff's Marks or marks confusingly similar to Plaintiff's Marks, including without limitation "LCR" and "LeftCenterRight", or any confusingly similar variation, infringes Plaintiff's Marks, and constitutes trademark infringement, false designation of origin, unfair competition, and misappropriation under federal and/or state law, as detailed above;

(B)     an Order preliminarily and permanently enjoining Defendants, their officers, directors, employees, agents, subsidiaries, parents, distributors, dealers, affiliates, related companies, and all persons in active concert or participation with them:

(1) from using any name, mark, domain name, source-identifier, or designation comprised of or containing and of Plaintiff's Marks, or any other confusingly similar name, mark, domain name, source-identifier, or designation in any manner likely to cause confusion with Plaintiff's Marks, or to otherwise cause injury to Plaintiff and/or its reputation; and

(2) from representing, by any means whatsoever, directly or indirectly, that Cardinal and Spin Master, their goods or services, and/or their activities originate from, are sponsored by, or are associated, affiliated, or connected with Plaintiff in any way;

(C) an Order excluding the importation of all goods, packaging, product displays, literature, advertisements, marketing and promotional materials, and any other materials bearing, without Plaintiff's authorization, marks identical to Plaintiff's Marks or marks confusingly similar to Plaintiff's Marks, including without limitation "LCR" and "LeftCenterRight", or any confusingly similar variation, pursuant to 15 U.S.C. § 1124 and other applicable laws;

(D) an Order requiring Walmart and Cardinal to destroy all goods, packaging, product displays, literature, advertisements, marketing and promotional materials, and any other materials bearing marks identical to Plaintiff's Marks or marks confusingly similar to Plaintiff's Marks, including without limitation "LCR" and "LeftCenterRight", or any confusingly similar variation, regardless of form, that are in, or come to be in, Walmart or Cardinal's possession, custody, or control;

(E) an Order requiring Walmart and Cardinal to disseminate pre-approved corrective advertising and send pre-approved letters to all customers, agents, and representatives to address the actual and likely confusion caused from their use of marks identical to Plaintiff's Marks or marks confusingly similar to Plaintiff's Marks, including without limitation "LCR" and "LeftCenterRight", or any confusingly similar variation;

(F) an Order requiring Walmart and Cardinal to account for and pay to Plaintiff all profits arising from Walmart and Cardinal's unlawful acts and that such profits be increased, pursuant to 15 U.S.C. § 1117 and other applicable laws;

(G) an Order requiring Walmart and Cardinal to pay Plaintiff damages, in an amount to be determined, resulting from Walmart and Cardinal's unlawful acts and that such damages be trebled, pursuant to 15 U.S.C. § 1117 and other applicable laws;

(H)     an Order requiring Walmart and Cardinal to pay Plaintiff's costs and attorneys' fees in this action, pursuant to 15 U.S.C. § 1117 and other applicable laws and

(I)     such other relief as the Court may deem appropriate.


**JURY DEMAND**

Plaintiff requests a trial by jury on all issues so triable.


Respectfully submitted this 30th day of July 2019.

| | |
|---|---|
| /s/Stephen D. Milbrath | /s/Christopher A. Zampogna |
| Stephen D. Milbrath | Christopher A. Zampogna |
| Florida Bar No. 239194 | New York Bar No. 2592178 |
| Byrd Campbell, P.A. | Zampogna, P.C. |
| 180 Park Avenue North, Suite 2A | 1776 K St. NW Ste. 700 |
| Winter Park, FL 32789 | Washington, DC 20006 |
| SMilbrath@byrdcampbell.com | caz@zampognalaw.com |
| 407-392-2285 | 202-223-6635 |
| Pro Hac Vice | Lead Counsel for Plaintiff |